In re Albert STRONG and Deborah Strong, Debtors.

Albert Strong and Deborah Strong, Plaintiffs,

v.

Option One Mortgage Corporation d/b/a H & R Block Mortgage, Defendant.

Bankruptcy No. 01–35854F.
Adversary No. 02–0626.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 31, 2004.

Zachary Perlick, Philadelphia, PA, for Debtors/Plaintiffs.

## OPINION

BRUCE FOX, Bankruptcy Judge.

The above-captioned chapter 13 debtors, Albert and Deborah Strong, have filed an adversary proceeding against Option One Mortgage Corporation d/b/a H & R Block Mortgage ("Option One"). The plaintiffs claim that a loan transaction they entered into with this defendant in May 1999 violated the federal Truth in Lending Act (TILA), the federal Home Ownership and Equity Protection Act (HOEPA), the federal Equal Credit Opportunity Act (ECOA), Pennsylvania's Act 6 of 1974 (Act 6), and Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL). They also assert that the loan agreement is unconscionable as a matter of Pennsylvania common law. In this pro-

ceeding, they seek to disallow the secured claim that Option One has filed in their bankruptcy case. They also seek damages in the amount of $379,792.24.[1]

Option One answered the complaint and maintains that its loan agreement complied fully with federal and state statutes, as well as common law. Alternatively, it contends that if there were any violations of federal law, such violations fell within permitted statutory tolerances, thereby precluding the assessment of any liability. As a result, the defendant seeks judgment in its favor and the allowance of its secured proof of claim.

By prior order, the plaintiffs' ECOA and Act 6 claims were dismissed in favor of the defendant. Thereafter, trial on the remaining four counts was held and the proceeding is now ripe for disposition.

## I.

Upon consideration of the testimony and documents offered in evidence, I make the following findings of fact:[2]

1. The plaintiffs are a husband and wife who reside at 1534 South 53rd Street, Philadelphia, Pennsylvania 19143. This property originally was purchased in 1968 or 1969 by Albert Strong's mother. 1 N.T. at 190. Mr. Strong inherited the realty when his mother died in 1984. *Id.* Upon his inheritance, the realty was titled in his name only. He and Mrs. Strong moved into the property in 1992. *Id.* at 190.

2. The plaintiffs are employed in the housekeeping departments of medical facilities and have been so for the past six years. *Id.* at 49, 154. Mr. Strong served for 12 years in the military, including 8 years stationed overseas. *Id.* at 190–91.

3. In the Spring of 1999, the plaintiffs decided to renovate their kitchen.

4. The plaintiffs obtained a $10,000 estimate from a contractor for this remodeling project.

5. Around that time, Mrs. Strong received a mailing from H & R Block Mortgage advertising home improvement loans. *Id.* at 52. Thereafter, on April 13, 1999, Mrs. Strong telephoned the defendant at its location in Tampa, Florida. In that telephone call, she informed defendant's employee that she was interested in a $ 10,000 loan for a kitchen remodeling project. *Id.* at 53.

6. In April 1999, the defendant did not offer loans as low as $10,000. *Id.* at 211.

7. The defendant's conversation log discloses four entries on April 13, 1999. Ex. D–1, Tab 1.[3] The first entry states that Mrs. Strong telephoned and requested to refinance her mortgage. *Id.* It is unlikely that Mrs. Strong made such a request and more likely that the defendant treated the loan query as such.

8. On July 14, 1998, the plaintiffs entered into a mortgage agreement with ContiMortgage Corporation in the amount of $40,800. Ex. P–16. This mortgage

---

1. *See* Plaintiffs' Post-trial Memorandum (unpaginated).

2. The parties failed to comply with a pretrial order that, *inter alia,* directed them to submit a statement of uncontested facts. In their post-trial memorandum, however, the plaintiffs listed 49 "stipulated facts." In its post-trial memorandum Option One states: "Plaintiffs have set forth in their post-trial memorandum the findings of fact to which the parties have stipulated." Defendant's Post–Trial Memorandum at 1. To the extent that a factual finding does not refer to testimony or an exhibit introduced at trial, such finding was among the stipulated facts.

3. Exhibit D–1 contains 53 tabs enclosing different documents. Hereinafter, all references to those documents will identify the tab number only.

agreement refinanced a prior mortgage loan that the plaintiffs had with Parkway Mortgage, Inc. ("Parkway") 1 N.T. at 87; Ex. Tab–34.[4] The plaintiffs primarily sought this loan to finance a $5,000 vacation. 1 N.T. at 88, 140–41, 191–92.

9. On or before April 20, 1999, an employee of the defendant telephoned Mrs. Strong and obtained certain information from her in connection with a possible loan offer.

10. On April 20, 1999, Mrs. Strong faxed copies of the plaintiffs' pay stubs and W–2 forms to the defendant in Florida, using a fax machine at a commercial copying center. 1 N.T. at 54–55; Ex. P–4.

11. On April 21, 1999, the defendant prepared a "loan proposal summary." Ex. Tab–4. The plaintiffs would be considered for a $56,000 loan that would refinance their existing home mortgage and provide them with approximately $11,000 in cash. Id. This proposal was based upon an estimated real estate value of $70,000. Ex. Tab–5.[5]

12. By cover letter dated April 22, 1999, H & R Block Mortgage mailed to the plaintiffs the following documents: a truth in lending disclosure statement (reflecting, inter alia, an amount financed in excess of $52,000); a good faith estimate of settlement costs; an application disclosure (noting an appraisal fee of $350); a servicing disclosure statement; an adjustable mortgage interest rate disclosure; and two unsigned borrower authorization forms (one for each plaintiff) allowing the defendant to obtain financial information from third parties. Ex. Tab–6.

13. Although the plaintiffs deny receiving these documents, I find it more likely that they did receive them. The April 22nd cover letter requested that the plaintiffs sign and return the unsigned borrower authorization forms. The defendant's files contain copies of the signed authorization forms dated April 27, 1999, with a fax date on the top of April 30, 1999. Ex. Tab–15.[6]

4. Ex. Tab–34, line 1501—showing disbursement of $25,946.02 in loan proceeds on July 14, 1998 to ContiMortgage—implies that the July 1998 loan refinanced a prior loan held by ContiMortgage. However, it is more likely, given the amount of the disbursement and other documents, that this loan repaid a prior mortgage held by Parkway Mortgage, Inc. dating from 1997. See Ex. Tab–22, at 2 (Parkway held a recorded mortgage in the amount of $26,000.); Ex. Tab–33 (Parkway mortgage was repaid on July 20, 1998.).

5. This exhibit is a residential loan application form completed by the defendant's employee on April 21, 1999 based upon information provided by Mrs. Strong. I note that 80% of $70,000 is $56,000. As will be discussed, the appraised value of the home turned out to be $66,000. The ultimate loan to the Strongs was $52,800, a figure that is exactly 80% of $66,000.

This is not a coincidence. Exhibit P–18 is a document prepared by the defendant prior to the appraisal. It states: "LTV [loan to value ratio] 80%." Id.

Exhibit P–15 is a residential loan application signed by the plaintiffs at the loan closing on May 12, 1999. Unlike the earlier application form, Ex. Tab–5, this latter form uses a realty valuation of $66,000.

6. Although conceding that they contain their authentic signatures, the plaintiffs argue that these faxed authorization forms do not include the name of the commercial entity used by them (Kinkos) on the top; thus, the plaintiffs contend that the two forms could not have been faxed by them to the defendant. Accordingly, they maintain that these forms were signed by them only at the closing on May 12, 1999, and were back-dated by the defendant or by the closing agent. I find the plaintiffs' position unlikely.

First, the dates on the two forms appear to be written by the same persons who signed them. See generally Fed.R.Evid. 901(b)(3) (incorporated in all bankruptcy cases by Fed. R. Bankr.P. 9017) (the trier of fact may determine the validity of a signature on a document, without the testimony of a handwriting

14. On or about April 23, 1999, the defendant engaged General American Corporation ("GAC") to arrange for the appraisal of the plaintiffs' home. Ex. Tab–16. This service request was confirmed on April 26, 1999 by GAC. *Id.*

15. On May 3, 1999, an appraisal report was completed valuing the plaintiffs' home at $66,000 as of April 30, 1999. Ex. Tab–18. This report was sent to the defendant on May 3, 1999. Ex. Tab–17. The cost of the appraisal was $350, and the defendant paid that sum to GAC on June 11, 1999. Ex. Tab–21.

16. GAC is in the business of arranging for appraisals, title searches and loan closings for lenders. 1 N.T. at 314. In this instance, when the defendant requested appraisal services from GAC, the latter contracted with a qualified local appraiser known to GAC, Tech Review Limited, to actually perform the appraisal.

17. A portion of the $350 fee paid by the defendant to GAC was retained by GAC. GAC paid the balance to the local appraiser. *Id.* at 317.

18. The average cost for appraisal management services in April 1999 in the Philadelphia region was $300 to $350 per appraisal. *Id.* The average cost for obtaining an appraisal of single-family residential property in the Philadelphia region in April 1999—without the use of an apprais-

al management firm—was only $250 to $275. *Id.* at 35.

19. After May 3, 1999, Mrs. Strong received a phone call from the defendant in which she was informed that her loan had been approved. *Id.* at 59. No loan terms—such as the amount of the loan, the monthly payments or the cash proceeds—were discussed during this conversation. *Id.* An appointment was made for someone to travel to the plaintiffs' home on May 12, 1999 for a loan closing.

20. On or after May 3, 1999, the defendant received a title insurance commitment from GAC. Ex. Tab–22. This commitment disclosed, *inter alia:* that Mr. Strong was the sole owner of the realty; that Parkway Mortgage Inc. and ContiMortgage held recorded mortgages against the property, which mortgage liens would be excepted from title coverage unless "GAC [obtains] a copy of a properly executed satisfaction of mortgage"; and that certain water and sewer taxes were assessed against the property. *Id.* The commitment report also noted: "In order to receive a reissue rate for title insurance, GAC requires a copy of the schedule A and B from the previous title insurance policy be faxed to our office." *Id.* at 1.

21. On May 10, 1999, the defendant requested that GAC arrange for a loan

___

expert, based upon signature comparisons); *accord United States v. Clifford,* 704 F.2d 86 (3d Cir.1983); *In re Ludwick,* 185 B.R. 238, 241 (Bankr.W.D.Mich.1995); *In re Koch,* 83 B.R. 898, 903 (Bankr.E.D.Pa.1988).

Second, they did not testify that they were asked to back-date loan documents at the loan closing; such an unusual request probably would have been memorable. Nor did they testify that these forms had already been dated when signed by them. Nor did they testify that they were asked to leave the dates blank. I note that they signed and dated many other loan forms on May 12th, including the loan application forms. They probably would have

recalled being asked to sign a form but to ignore the date.

Third, the signed authorization forms clearly have the fax date of April 30, 1999 at 11:37 on the top. The plaintiffs offer no explanation for how such a date and time could have been placed on these documents if they were first signed by them on May 12th.

Finally, it is unlikely that the defendant would have consented to enter into a loan transaction on May 12, 1999, without previously obtaining authorization forms from the plaintiffs. These forms permit a prospective lender to verify financial information about the proposed borrower from third parties.

closing in the plaintiffs' home on May 12, 1999 at 7 P.M. Ex. Tab–20. This request noted that the loan amount would be $52,800, with a settlement fee of $350, recording fees of $32 per document, title insurance fee of $546.75, an endorsement fee of $100, a courier fee of $15 and a satisfaction fee of $32. *Id.*

22. GAC arranged for title insurance to be issued by American Pioneer Title Insurance Company for a premium of $546.75. Ex. Tab–23.

23. The eligibilities and rates for title insurance premiums and endorsements are submitted by the Title Insurance Rating Bureau of Pennsylvania to the Pennsylvania Insurance Department for approval. The state-approved eligibilities and rates for title insurance premiums are set forth in the Rate Manual of the Title Insurance Rating Bureau of Pennsylvania (the "Title Insurance Rate Manual"). The basic rate for title insurance on a $52,800 loan is $546.75. The reissue rate for title insurance on a $52,800 loan is $492.08. The refinance rate for title insurance on a $52,800 loan is $393.66. Ex. P–34 ¶¶ 5.3, 5.6, 5.20.

24. The Title Insurance Rate Manual, Ex. P–34, provides:

¶ 5.3: A purchaser of a title insurance policy shall be entitled to purchase this coverage at the reissue rate if the real property to be insured is identical to or is part of real property insured 10 years immediately prior to the date the insured transaction closes when evidence of the earlier policy is produced notwithstanding the amount of coverage provided by the prior policy; and

¶ 5.6: When a refinance or substitution loan is made within 3 years from the date of closing of a previously insured mortgage or fee interest and the premises to be insured are identical to or part of the real property previously insured

and there has been no change in the fee simple ownership, this Charge shall be 80% of the reissue rate.

The reissue rate is 90% of the basic rate. *Id.* ¶ 5.20.

25. The plaintiffs never provided a copy of the earlier title insurance policy obtained during the ContiMortgage transaction to the defendant or to the title agent, GAC. The plaintiffs never provided information to the title agent or the defendant that their property had been insured for the ten years immediately prior to May 12, 1999.

26. The defendant had obtained a copy from ContiMortgage of the HUD–1 settlement sheet prepared on July 14, 1998 when the plaintiffs borrowed $40,800 from that lender. 2 N.T. at 26–27. The settlement sheet reflects that the plaintiffs paid $469.75 for title insurance issued by Stewart Title Company. Exs. P–32; Tab–34. The defendant never informed the plaintiffs that they should provide the earlier title insurance policy to it or to GAC.

27. Mr. Strong would have qualified for the refinance rate for title insurance of $393.66 if GAC had been provided with the earlier title policy and if the property had remained solely in the name of Mr. Strong. The plaintiffs would have been eligible for the reissue rate of $492.08, despite the title transfer, had GAC been shown that title insurance had been obtained on that property during the past ten years.

28. On April 27, 1999, ContiMortgage provided a payoff statement to the defendant effective through May 27, 1999. Ex. Tab–31. This payoff figure included a mortgage satisfaction fee of $34. *Id.* Moreover, on May 10, 1999—just two days prior to closing—ContiMortgage sent or faxed a letter to the defendant informing it that the Parkway mortgage had been paid in full on July 20, 1998, and that this

mortgage "will be satisfied at the county/town clerk's office and sent to the customer after recording." Ex. Tab–33. The letter does not state that the mortgage satisfaction would be recorded at ContiMortgage's expense. *Id.* The July 14, 1998 HUD–1 settlement statement from the ContiMortgage loan does not reflect that the plaintiffs were charged for satisfying the Parkway Mortgage. Ex. Tab–34.

29. On or about May 12, 1999, the defendant sent a document styled "Instructions to Closing Agent" to Mr. Louis Stevens in Philadelphia. Exs. P–14; D–3.[7] These instructions noted that, upon closing, the defendant must hold a first lien position on the plaintiffs' residence. *Id.* Accordingly, the plaintiffs would be required to satisfy the mortgage held by ContiMortgage with the proceeds of the instant loan. The instructions also required that a "quit claim deed [be] prepared adding Deborah Strong to title." *Id.* The defendant explained that it has a company policy that: "If you're going to sign the note, and we're using your income to qualify the loan, we would like you to have an interest in the property on title." 1 N.T. at 247. The instructions to the closing agent also provided that "EACH borrower who has ownership interest in the real property must be given TWO copies of the Notice of Right to Cancel and 1 copy of the Truth in Lending Disclosure Statement." Ex. D–3.

30. On May 12, 1999, Ms. Kim Stevens came to the plaintiffs' residence to represent the defendant in the loan closing. She was not the defendant's employee, 2 N.T. at 26, and thus was likely engaged by Mr. Louis Stevens on behalf of GAC.

31. Ms. Stevens spent about thirty minutes with the Strongs. The final fifteen minutes were spent signing papers. The plaintiffs did not read all of the loan documents that they signed. 1 N.T. at 175, 183, 188.

32. At the loan closing, the plaintiffs signed a variety of documents including: an adjustable rate note for $52,800, with an initial monthly payment of principal and interest in the amount of $402.25, which amount would remain unchanged until June 1, 2001—Ex. P–8; a mortgage in favor of Option One in the amount of $52,-800—Ex. P–9; a warranty deed with Albert Strong as the grantor and Albert and Deborah Strong (husband and wife) as the grantees—Ex. P–10; a HUD–1 loan settlement sheet—Ex. P–11; a truth in lending disclosure statement—Ex. P–12; and a completed "Notice of Right to Cancel" allowing for the cancellation of the loan agreement until midnight on May 15, 1999—Ex. P–6. Immediately above their signatures on Exhibit P–6 is printed: "On the date listed above I/we the undersigned each received two (2) completed copies of the notice of right to cancel."

33. The loan transaction on May 12, 1999 resulted in the plaintiffs receiving $5,258.70 in loan proceeds. Exs. P–11; Tab–44. The plaintiffs used these proceeds, plus a payment arrangement with their contractor for the balance of the contract, to have their kitchen remodeled. 1 N.T. at 86–87, 164.

34. The loan had an adjustable interest rate, initially set at 8.4%, but which could rise to 14.4% beginning June 1, 2001, and could change every six months thereafter. Ex. P–8 ¶ 4.

---

**7.** The plaintiffs and the defendant often introduced in evidence copies of identical documents. In this instance, however, Exhibit D–3 is not identical to Exhibit P–14. The former contains an additional page of instructions not included in the latter. This additional page—"Instructions to Closing Agent For Completion of Notice of Right To Cancel"—is relevant to this dispute and will be addressed below.

35. The following documents were given to the plaintiffs at the May 12th closing and signed by them:

- Uniform Residential Loan Application
- Prepayment Charge Disclosure
- Address Certification
- Compliance Agreement
- Notice Regarding Copy of Appraisal
- Request for Taxpayer I.D. # and Request for Copy or Transcript of Tax Form (undated)
- In Accordance with Equal Credit Opportunity Act form
- Standard Flood Hazard Determination (5/3/99)
- Agreement for the Arbitration of Disputes
- Hazard Insurance Requirements & Authorization form
- Initial Escrow Account Disclosure Statement
- Impound/Escrow Authorization
- Voluntary Escrow Account Payments Disclosure
- Limited Power of Attorney
- Untitled document re: tax service authorization
- Servicing Disclosure Statement
- Settlement Statement
- TILA Disclosure Statement
- Notice of Right to Cancel
- Good Faith Estimate of Closing Costs
- Adjustable Rate Note
- Adjustable Rate Rider Mortgage
- Untitled document detailing fees/payoffs pertaining to loan (undated)
- Instructions to Closing Agent

The plaintiffs were given a folder to store copies of the loan documents provided to them. Ex. P–7. Mrs. Strong placed her loan documents in this folder and stored the folder in a safe at her home. 1 N.T. 75. She later gave the folder to her bankruptcy attorney. *Id.* She claims that she removed no documents from the folder prior to giving it to her bankruptcy attorney. *Id.* at 76

36. At the time of the loan closing, the plaintiffs understood that they would receive only about $5,200 in cash from this loan transaction. *Id.* at 133, 144, 184–85. They also understood that their monthly payments to the defendant would be about $402. *Id.* They probably also realized that the ContiMortgage loan was being repaid by the new loan proceeds since they could not afford to pay both ContiMortgage and Option One. *Id.* at 135–36, 167–68.

37. The plaintiffs also understood on May 12, 1999 that they had the right to rescind or cancel the loan agreement. *Id.* at 139, 187–88.

38. The type of title insurance purchased as part of the May 12, 1999 closing was an ALTA Short Form Residential Loan Policy, with endorsements for ALTA 9 and ALTA 8.1.

39. The charge for an ALTA Short form residential loan policy is $75 in addition to the otherwise applicable charge.

40. The charge for an ALTA 9 Endorsement is $75.

41. The charge for an ALTA 8.1 Endorsement is $50. The plaintiffs were charged this amount.

42. The plaintiffs were charged the following fees at the loan closing:

- Loan Discount Fee ($2,640)
- Appraisal Fee ($350)
- Tax Service Fee ($70)
- Flood Search Fee ($15)
- Loan Processing Fee ($495)
- Settlement or closing fee ($350)
- Document Preparation Fee ($100)
- Title Insurance Premium Fee ($546.75)

· Title Insurance Endorsement Fees ($150)

· Recording Fees ($32)

· Deed Recording ($37)

· Satisfaction Fee ($32)

· Courier Fee ($15)

Exs. P–11; Tab–44. In addition, the Strongs were required to pay $184.80 in prepaid interest, $128.49 toward prepaid insurance premium and $135.75 in prepaid county taxes at the closing.

43. The following $3,834.47 in fees are prepaid finance charges which would be deducted from the principal loan amount to arrive at the amount financed under TILA:

· Loan Discount Fee ($2,640)

· Tax Service Fee ($70)

· Loan Processing Fee ($495)

· Prepaid Interest ($184.80)

· Settlement or closing fee ($350)

· Title Insurance ($54.67)

· Title Endorsement 9.0($25)

· Courier Fee ($15)

44. The following $3,664.67 in fees would be included in points and fees for purposes of HOEPA:

· Loan Discount Fee ($2,640)

· Tax Service Fee ($70)

· Loan Processing Fee ($495)

· Settlement or closing fee ($350)

· Title Insurance ($54.67)

· Title Endorsement 9.0($25)

· Courier Fee ($15)

· Flood Search Fee ($15)

45. The following fees must be deducted from the principal loan amount to arrive at the total loan amount for purposes of HOEPA:

· Loan Discount Fee ($2,640)

· Tax Service Fee ($70)

· Loan Processing Fee ($495)

· Prepaid Interest ($184.80)

· Settlement or closing fee ($350)

· Title Insurance ($54.67)

· Title Endorsement 9.0($25)

· Courier Fee ($15)

· Flood Search Fee ($15)

46. The fees listed in factual finding number 41 included the following charges as being unreasonable: Title Insurance ($54.67); Title Endorsement 9.0($25).

47. The courier fee was included because in factual findings Nos. 42 and 43 because the defendant required imposition of the charge. The flood search fee was included in findings Nos. 42 and 43 because it was paid directly to the defendant. The title insurance and title endorsement charges were also included in findings Nos. 42 and 43 to the extent they were unreasonable.

48. The TILA disclosure statement informed the plaintiffs that their loan involved a finance charge of $128,718.21 and an amount financed of $48,760.20, and would result in a total of payments of $177,478.41. The amount financed was not itemized. Instead, the plaintiffs were provided with a good faith estimate of closing charges. Ex. Tab–37.

49. The defendant did not deliver to the plaintiffs the advance disclosures required for a loan governed by the Home Ownership and Equity Protection Act (HOEPA).

50. The plaintiffs made the following payments of principal, interest and late charges on their loan:

| Year | Principal | Interest | Late Charges | Escrow Payments |
|------|-----------|----------|--------------|-----------------|
| 1999 | $199.90 | $2,398.93 | $ 71.62 | $ 792.73 |
| 2000 | $404.15 | $4,036.76 | $193.92 | $1,073.11 |
| 2001 | $291.34 | $2,990.29 | $ 96.56 | $ 746.40 |
| 2002 | $114.08 | $1,750.36 | $ 0.00 | $ 373.20 |
| 2003 | $194.80 | (through.trustee) | | |

51. The plaintiffs filed a chapter 13 case on November 9, 2001. Thereafter, the defendant filed a secured proof of claim in the amount of $54,199.64, dated December 17, 2001. Ex. P–40.

## II.

I reach the following legal conclusions:

1. The actions of the defendant did not violate Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S.A. § 201–1 *et seq.*

2. The loan between the plaintiffs and the defendant was not unconscionable under Pennsylvania common law.

3. The loan agreement did not fall within the scope of the federal Home Ownership and Equity Protection Act (HOE-PA), codified, in part, at 15 U.S.C. § 1639, because the "points and fees" did not exceed 8% of the loan amount. *See* 15 U.S.C. § 1602(aa); 12 C.F.R. § 226.32(a)(1)(ii).

4. The defendant did not violate the provisions of the federal Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 *et seq.*, and Regulation Z. Any misdisclosures made were not material because the errors fell within the safe harbor of 15 U.S.C. § 1605(f)(2)(A). And any misdisclosures also fell within the tolerances permitted by 15 U.S.C. § 1605(f)(1).

## III.

### A.

As noted at the outset of this opinion, there are four remaining counts in the plaintiffs' complaint. The alleged violation of the Truth in Lending Act and the alleged violation of the Home Ownership and Equity Protection Act—counts I and II—are related, in that both claims assert that certain fees charged to the plaintiffs in connection with the May 1999 loan trans-

action should have been included in the finance charge for the loan. *See* 1 N.T. at 4. If so, in certain instances, those federal statutes impose serious consequences on lenders.

Counts V and VI are based upon state law and involve a claim for violation of Pennsylvania's Unfair Trade Practices Act and a claim that the loan transaction was unconscionable in its terms. These claims are also related. Essentially, the plaintiffs maintain that all they sought from Option One was a small $10,000 home remodeling loan. They instead entered into a loan agreement whereby they borrowed more than $50,000, received only about $5,000 in cash, paid about $5,000 in fees and increased their monthly mortgage payments by about $100 initially, with the potential for a much larger increase due to the adjustable rate component of the mortgage.

The defendant responds that it fully complied with all federal law requirements. To the extent there were any misdisclosures, it argues that these unintentional errors are minor and fall easily within the tolerances permitted by the statutes and regulations. As for the state law counts, the defendant contends that the plaintiffs were sufficiently informed of all the loan terms, had they chosen to review the written documents. It further maintains that the plaintiffs were familiar with this type of refinancing transaction, having entered into a similar agreement the year before with a different lender. They were aware of their opportunity to cancel the loan and elected not to do so. And the loan provisions were reasonable given plaintiffs' financial circumstances.

Not only do the parties differ in their statutory applications and construction of the fairness of the transaction, they also dispute the extent, if at all, that a lender is responsible to a borrower to minimize the

costs and fees paid by a borrower in a loan transaction. Specifically, did Option One have any obligation to insure that the Strongs reimburse it for as low a title insurance premium as possible? Similarly, if Option One elected to use an appraisal management firm, rather than hire an appraiser directly, was it required to seek reimbursement from the plaintiffs only of the actual appraiser's fee and therefore pay at its own expense the component of the fee retained by the management firm?[8]

## B.

Preliminarily, I must address the defendant's objection to the plaintiffs' attempt to raise at trial certain issues that were not expressly raised in the complaint or in any pleading prior to trial.

Although the plaintiffs were specific in their allegations of TILA violations, particularly in their motion for summary judgment, they raised for the first time at trial the issue of regulatory compliance concerning the number of rescission notices given to the Strongs at the loan closing.

Pursuant to 15 U.S.C. § 1635(a):

Except as otherwise provided in this section, in the case of any consumer credit transaction (including opening or increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

Thus, Congress has afforded all borrowers who enter into loan transactions with lenders governed by TILA and use their homes as collateral a three-day right of rescission or cooling-off period. *See In re Porter*, 961 F.2d 1066, 1073 (3d Cir.1992). As Option One was taking a security interest in the Strongs' home, this statutory right of rescission applied.

Congress left the proper method of disclosing this right, as well as its exercise, to regulation by the Federal Reserve Board ("FRB"). In Regulation Z, specifically 12 C.F.R. § 226.23(b)(1), the FRB has directed that:

In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each

---

**8.** I do not construe the plaintiffs' post-trial memorandum as suggesting, however, that the defendant was in a common law fiduciary relationship with the plaintiffs. *See generally I & S Associates Trust v. LaSalle National Bank*, 2001 WL 1143319, at *7 (E.D.Pa. Sept.27, 2001) ("Under Pennsylvania law, the lender-borrower relationship does not ordinarily create a fiduciary duty."); *Gonzalez v. Old Kent Mortg. Co.*, 2000 WL 1469313, at *6 (E.D.Pa. Sept.21, 2000); *Federal Land Bank of Baltimore v. Fetner*, 269 Pa.Super. 455, 410 A.2d 344 (1979). Thus, if the plaintiffs are correct, any obligation imposed upon the lender must arise from federal regulation.

consumer entitled to rescind (one copy to each if the notice is delivered by electronic communication as provided in § 226.36(b)).

Thus, Mr. and Mrs. Strong were each entitled to two copies of the notice of rescission.

■ A day or two before trial, the defendant was first informed that the plaintiffs asserted that TILA was violated because they each only received one copy of the rescission notice, rather than two. 1 N.T. at 68, 73. At the trial, the defendant objected to evidence intended to support this TILA rescission claim; however, both parties requested that the propriety of this issue be decided after conclusion of the trial. The plaintiffs maintain that their answer to a pretrial interrogatory, asking them to identify all documents received by them at the loan closing on May 12, 1999, and to which they responded that they received "two copies only" of loan documents, which documents included notice of their right to rescind the loan, placed the defendant on sufficient notice of the issue to prepare for trial.

Fed. R. Bankr.P. 7015 incorporates Fed. R.Civ.P. 15 in adversary proceedings. Rule 15(b) states in relevant part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Therefore, if a defendant objects to evidence at trial as being outside the scope of the claims raised by the plaintiff in his pleadings, and if the defendant has not expressly or implicitly consented to a determination of the additional claim, a court may admit the evidence and treat the underlying complaint as amended to encompass this additional claim if to do so would be in the interests of justice, unless the defendant demonstrates prejudice. *See, e.g., Hardin v. Manitowoc–Forsythe Corp.,* 691 F.2d 449, 457 (10th Cir.1982); *Seybold v. Francis P. Dean, Inc.,* 628 F.Supp. 912, 914 (W.D.Pa.1986).[9] As the Third Circuit Court of Appeals has instructed:

> The primary consideration in determining whether leave to amend under Fed. R.Civ.P. 15(b) should be granted is prejudice to the opposing party.... The principal test for prejudice in such situations is whether the opposing party was denied a fair opportunity to defend and to offer additional evidence on that different theory.

*Evans Products Co. v. West American Ins. Co.,* 736 F.2d 920, 924 (3d Cir.1984) (citations omitted); *accord, e.g., Still v. Regulus Group LLC,* 2004 WL 32378, at *1

---

9. In the absence of demonstrating prejudice, a defendant may request a continuance of the trial to prepare a response to the new evidence. *Hardin v. Manitowoc–Forsythe Corp.,* 691 F.2d at 457. Here, Option One declined to request a continuance. Accordingly, I must decide whether consideration of this issue would be prejudicial.

(E.D.Pa. Jan.5, 2004); *see generally Lundy v. Hochberg,* 79 Fed.Appx. 503, 506 (3d Cir.2003).

Clearly, Option One did not consent at trial, either expressly or implicitly, to the plaintiffs' attempt to assert a TILA violation concerning the number of cancellation notices provided to the Strongs. The discovery response referred to by the plaintiffs may have, at best, given the defendant some indicia that the plaintiffs contended that they only received two rather than four copies of the required document; it would not have provided adequate notice, however, that the plaintiffs intended to assert a TILA claim based on this alleged fact. *See generally Laffey v. Independent School Dist. No. 625,* 806 F.Supp. 1390, 1401 (D.Minn.1992) (discovery inquiries do not amount to implied consent); *see also Joiner Systems, Inc. v. AVM Corp., Inc.,* 517 F.2d 45, 48 (3d Cir.1975) (testimony tending to prove both alleged and unalleged claim not allowed as evidence that defendant consented to unalleged claim).

Parties sometimes decide not to pursue certain claims as too costly or unnecessary; or they may not realize that certain actions constitute a violation of a statute or common law and thus neglect to make the claim. Therefore, the plaintiffs' interrogatory response that included the assertion that they received two copies of the Notice to Rescind does not translate into adequate notice of their claiming a TILA violation on that basis.

At trial, Mrs. Strong testified regarding receipt of the Notices to Rescind. *See, e.g.,* 1 N.T. at 65–66, 74–76. While objecting to inclusion of the new issue, the defendant provisionally allowed such testimony should its objection be overruled. *See Id.* at 2–3, 66–74. The defendant renewed its objection in its post-trial memorandum. *Id.* at 26–27.

Unfortunately, I cannot look to the parties' Joint Pretrial Statement to determine what claims were identified by the parties for trial, or what facts concerning those claims were in dispute, because the parties neglected to file one. *See Joiner Systems,* 517 F.2d at 47 (noting that a pretrial statement would have "exposed and corrected the latent misunderstanding with respect to the claims asserted"). At the trial, the attorneys alluded to this cancellation notice issue as first arising in a draft of a pretrial document they had been exchanging in the days immediately prior to trial, but ultimately did not file. *See* 1 N.T. at 2, 71–72. The plaintiffs' attorney agreed at trial that the issue was not included in either the complaint or the cross-summary judgment pleadings. 1 N.T. at 71.[10]

In *In re Williams,* 291 B.R. 636 (Bankr. E.D.Pa.2003), my colleague [now Chief] Judge Diane Sigmund considered whether the issue concerning the number of rescission notices provided to the plaintiffs by

---

**10.** I find unpersuasive plaintiffs' counsel's position that he intended to raise this disclosure issue on or before the date that the plaintiffs answered the defendant's interrogatories. After discovery had been completed, the plaintiffs moved for partial summary judgment on a few counts and the defendant cross-moved for summary judgment on all counts. In responding to the cross-motion for summary judgment, the plaintiffs never mentioned this alleged TILA violation.

The plaintiffs' attorney explained that he viewed the issue as involving material facts in dispute. 1 N.T. at 67. That explains only why the plaintiffs did not seek summary judgment on that issue. Had I granted summary judgment for the defendant on count I (the TILA count of the complaint) the claim now sought to be raised would have been precluded. Thus, had the plaintiffs been aware of and had they intended to assert this claim prior to the eve of trial, the issue would have been raised as a defense to the cross-motion for judgment on count I. It was not.

the defendant could be considered at trial when the issue was not expressly raised in the plaintiffs' complaint. *Id.* at 647. She concluded that the issue had been sufficiently identified in the parties' joint pretrial statement to place the defendant on adequate notice and thus preclude any claim of prejudice. *Id.*

In this proceeding, there was no joint pretrial statement filed. Rather, the issue became known to the defendant only on the eve of trial. In responding to this claim, the defendant did introduce into evidence the plaintiffs' written acknowledgment, made at the loan closing, that they each received two copies of the rescission notice. Ex. Tab–42. But this written acknowledgment gives rise only to a statutorily created rebuttable presumption of delivery. 15 U.S.C. § 1635(c). The plaintiffs have attempted to rebut the presumption by their testimony regarding the restrictive custody of the loan documents since the loan closing. *See Davison v. Bank One Home Loan Services,* 2003 WL 124542, at *4 (D.Kan. Jan. 13, 2003); *In re Williams,* 291 B.R. at 648.

Had the defendant been placed on adequate notice of this issue, it may have questioned the plaintiffs about the cancellation notices during their depositions. More significantly, its instructions to the loan closing agent clearly noted the requirement that two rescission notices were to be provided to each borrower. Ex. D–3. The defendant could have called the closing agent—who apparently lives in Philadelphia, 1 N.T. at 144—as a witness. This witness may have recalled the loan closing and the documents provided to the Strongs. Even if she had no such memory, if she had experience with similar loan closings, she may have been able to testify as to her normal practice, if any, concerning rescission notices. *See* Fed.R.Evid. 406; *Slomiak v. Bear Stearns & Co.,* 597

F.Supp. 676, 685 (S.D.N.Y.1984). The defendant had little or no opportunity to have Ms. Stevens testify because her conduct was only challenged at the very last moment before trial.

Therefore, in these circumstances, I conclude that it would be unfairly prejudicial to permit the plaintiffs to amend their complaint and first raise the issue concerning the number of rescission notices on the literal eve of trial. Accordingly, the defendant's objection to any Rule 7015 amendment is sustained. *See generally Keeler v. Hewitt,* 697 F.2d 8, 14 (1 st Cir.1982) (denying introduction of evidence in support of a new claim is within the discretion of the trial court when the defendant could have sought discovery on the issue and could have offered rebuttal evidence); *Rio Rancho Estates, Inc. v. Beyerlein,* 662 F.2d 700, 704–05 (10th Cir.1981) (evidence in support of a claim first noticed on the eve of trial would be prejudicial and thus inadmissible).

### C.

■ I reach the opposite conclusion concerning the defendant's objection to my consideration of the plaintiffs' challenge to the reasonableness of the document preparation fee.

The plaintiffs argued in their post-trial memorandum, as part of their HOEPA and TILA claims, that a $100 deed document preparation fee should be included in the loan's points and fees and/or the finance charge. Plaintiffs' Memorandum, at ¶ 2(a)(ii)(1). In its post-trial memorandum, Option One contends that this specific fee was not identified as unreasonable nor not bona fide in the plaintiffs' complaint, or in any prior pleadings. Defendant's Post–Trial Memorandum at 22 n. 2. Nevertheless, this issue may now be considered to the extent relevant to counts I and II.

Unlike the rescission notice issue, determination of the reasonableness of this document fee—which fee concerns the preparation of a deed transferring title from Mr. Strong to himself and his wife—had been implicitly raised in the pleadings. It is subsumed in the plaintiffs' contention that the title insurance charge was unreasonable because they should have qualified for the refinance rate rather than the basic rate. Thus, the defendant was placed on adequate notice of the issue to prepare it for trial. Moreover, this was not an issue involving facts that might be learned from the plaintiffs in discovery. Nor is it likely that the defendant would have offered additional evidence in support of its contention of reasonableness, beyond that which was offered at trial. Thus, the defendant's counsel stated in his opening remarks:

> Mr. Sullivan: There's also some discussion about (indiscernible) in this case, and with regard to a document preparation fee. You will see that there was a document prepared, there was a deed, and a fee was charged from General American Corporation of $100. And the evidence will show that that—that task was being performed.

1 N.T. at 16. Therefore the defendant was aware of the issue and if not consenting to its consideration at trial, certainly would not be prejudiced by such consideration. *See generally United States f/u/b/o Seminole Sheet Metal Co. v. SCI, Inc.,* 828 F.2d 671, 677 (11th Cir.1987). Accordingly, the defendant's objection on this point is overruled.

### D.

Next, I turn to the issue of early disbursal of the loan proceeds. The plaintiffs argued pre-trial that the defendant improperly distributed the loan proceeds check at closing rather than after the three-day rescission period. *See* Supplemental Memorandum in Support of Plaintiffs' Motion for Summary Judgment (unpaginated) at D; *see generally* 12 C.F.R. § 226.23(c); *Curry v. Fidelity Consumer Discount Co.,* 656 F.Supp. 1129, 1131 (E.D.Pa.1987). Although this contention was alluded to at trial, the plaintiffs' attorney eventually abandoned it, *see* 2 N.T. at 55 (The Court: You've withdrawn the issue about early disbursal, correct? Mr. Berry: Right.), and did not argue it post-trial.

Some courts have concluded that the failure of a party to address issues in a post-trial submission may constitute a waiver of those issues:

> The Complaint ambitiously purports to seek relief under possibly all sections of §§ 523(a)(2) and 727(a). However, our focus is narrowed considerably by the Plaintiff's failure to argue, or even mention, in her voluminous post-trial Brief, any subsections of §§ 523(a) or 727(a) other than 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), 727(a)(2)(A), 727(a)(2)(B), and 727(a)(4)(A). We find that the Plaintiff's failure to argue the applicability of the remaining subsections of §§ 523(a)(2) and 727(a) in her post-trial Brief results in abandonment of any such claims and, hence, their removal from the court's consideration.

*In re Henderson,* 134 B.R. 147, 155 (Bankr.E.D.Pa.1991); *see Paris Utility Dist. v. A.C. Lawrence Leather Co.,* 665 F.Supp. 944, 958 n. 15 (D.Me.1987) ("In its complaint, the District also sought recovery for certain clean-up costs incurred in 1986. The District has, however, failed to address this claim in its post-trial briefs; the Court thus considers the claim to have been waived."), *aff'd,* 861 F.2d 1 (1 st Cir.1988). Therefore, even if this issue had not been expressly withdrawn at trial, any claim that the loan proceeds were prematurely disbursed would be waived by

its omission from the plaintiffs' post-trial submissions.

## IV.

Having dealt with those preliminary issues, I must now consider whether the evidence offered at trial gives rise to any or all of the four remaining claims asserted by the plaintiffs. I begin first with the plaintiffs' contention that the loan agreement violated state statutory and common law because it was grossly unfair or the product of deception.

Specifically, in Count V of their complaint, the plaintiffs alleged that the defendant violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 Pa.C.S.A. § 201–1 et seq., by "represent[ing] to Plaintiffs that the consolidation and refinancing of their preexisting debt had benefits that it did not have ... [and by] engag[ing] in fraudulent or deceptive conduct which created a likelihood of confusion." Complaint ¶ 45; see 73 Pa.C.S.A. § 201–2(4)(v), (xxi) (the latter subparagraph is referred to as the "catch-all provision").[11] They alleged that the defendant

> utilized artifice and deception to take advantage of Plaintiffs' ignorance, confusion and lack of sophistication. More specifically, Defendant knew or should have known that Plaintiffs, up to the time of settlement, had no idea of how much they were borrowing; were unaware of the various charges imposed on them in the transaction and the fact that some of those charges were illegal under Pennsylvania law; and were unaware of the disadvantages and risks of refinancing and consolidating their pre-existing debt. Defendant nonetheless omitted information and explanations concerning these matters.

Complaint at ¶¶ 40–41. The plaintiffs also argued that the defendant failed to disclose that it would charge more for refinancing the plaintiffs' existing loan than to provide a junior mortgage for the amount the plaintiffs requested. Id. at ¶ 42.

In Count VI of their Complaint, the plaintiffs alleged that "[t]he terms of the transaction were grossly one-sided and unfavorable to Plaintiffs," and so were unconscionable. Id. at ¶ 52. Moreover, they alleged that they are "now faced with a mortgage debt [that] they cannot possibly repay" and "did not request." Id.

In both counts, the plaintiffs generally complain that they entered into an unnecessary loan refinancing agreement, the terms of which they were unaware, and which were extremely disadvantageous to them. Because the allegations in large part overlap, I will address both claims at the same time.[12]

---

11. 73 Pa.C.S.A § 201–2 states:
 4) "Unfair methods of competition" and "unfair or deceptive acts or practices" mean any one or more of the following:
 * * *
 (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;
 * * *
 (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

12. Though not explicitly alleged in their pleadings, to the extent the plaintiffs implicitly contend that the defendant's failure to provide a $10,000 loan, as requested, constituted a material misrepresentation, such a contention was unproven. The defendant oral statement that it would "see what [it] could do," 1 N.T. at 53 (testimony of Mrs. Strong), did not amount to a promise to provide the plaintiffs with a second mortgage in the amount of $10,000; it merely represented that this lender might tender some type of loan offer to the plaintiffs. Moreover, any reliance on the defendant's statement would not be justified. Furthermore, this issue regarding offers and

## A.

 "Under Pennsylvania law, the essential elements of common law fraud include a material misrepresentation of an existing fact, scienter, justifiable reliance on the misrepresentation, and damages." *Booze v. Allstate Ins. Co.*, 750 A.2d 877, 880 (Pa.Super.2000) (citing *Hammer v. Nikol*, 659 A.2d 617, 620 (Pa.Comwlth.1995)). These elements must be proven by the plaintiffs by clear and convincing evidence. *Weisblatt v. Minnesota Mutual Life Ins. Co.*, 4 F.Supp.2d 371, 377 (E.D.Pa.1998). Under the catchall provision of Pennsylvania's Unfair Trade Practices Act, the plaintiffs may prove either common law fraud or deceptive conduct. *In re Crisomia*, 2001 WL 1924616, at *2 (Bankr.E.D. Pa. June 8, 2001). Thus, to prevail on Count V, the plaintiffs may prove that the defendant engaged in deceptive conduct which created a likelihood of confusion. *See Thompson v. Glenmede Trust Co.*, 2003 WL 1848011, at *1 (Pa.Com.Pl. Feb.18, 2003) (to establish claim under catchall provision, party must either prove elements of common law fraud or that defendant's deceptive conduct caused harm to plaintiff); *Abrams v. Toyota Motor Credit Corp.*, 2001 WL 1807357, at *7 (Pa.Com.Pl. Dec.5, 2001) (plaintiffs need to establish that conduct was in fact deceptive and caused the alleged harm suffered); *see also In re Milbourne*, 108 B.R. 522, 533–534 (Bankr.E.D.Pa.1989) (borrower need not prove actual fraud to have a UTPCPL cause of action; rather, proof of any violation of a consumer protection act or any pervasive violation of the terms of a contract is sufficient to give rise to a cause of action under UTPCPL) (citing *In re Andrews*, 78 B.R. 78, 83 (Bankr.E.D.Pa. 1987)).

Apparently, Pennsylvania trial courts have accepted that an unconscionable contract would fall within the scope of Pennsylvania's UTPCPL:

Count Five also appears to be, in part, a claim based on the unconscionability of the Agreements. It is unclear if this is intended to be a separate cause of action more properly pled in a separate count or an assertion in support of the Plaintiff's UTPCPL claim. Pennsylvania courts hold that unconscionability does not come into play simply because of a disparity in contracting parties' bargaining power, but requires there to be "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Wittmer[Witmer] v. Exxon Corp.*, 495 Pa. 540, 551, 434 A.2d 1222, 1228 (1981) (citing *Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir. 1965)). The Plaintiff has advanced support for a finding of unconscionability, and, to the extent that the Plaintiff's allegations of unconscionability are merely support for a UTPCPL claim, its allegations and Count Five may stand.

*Anoushian v. Rent–Rite, Inc.*, 2002 WL 1023438, at *5 n. 13 (Pa.Com.Pl.2002); *accord Commonwealth ex rel. Zimmerman v. Nickel*, 26 Pa. D. & C.3d 115, 137, 1983 WL 286 (Pa.Com.Pl.1983) ("Unconscionability is a basis for injunctive relief under the UTPCPL."); *see also Korn v. Avis Rent–a–Car System, Inc.*, 8 Pa. D. & C.3d 640, 1977 WL 227 (Pa.Com.Pl.), *amended by* 8 Pa. D. & C.3d 667, 1977 WL 230 (Pa.Com.Pl.1977).

 In Pennsylvania, the doctrine of unconscionability is an accepted common law defense to the enforcement of an alleg-

counteroffers was addressed in my earlier memorandum granting the defendant sum-

mary judgment on plaintiffs' Equal Credit Opportunity Act claim.

edly unfair contract or contract term.[13] "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Witmer v. Exxon Corp.*, 495 Pa. at 551, 434 A.2d 1222 (quoting *Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965)). Thus, the inquiry regarding unconscionability is two-fold. "First, for a contract or a term to be unconscionable, the party signing the contract must have lacked a meaningful choice in accepting the challenged provision. Second, the challenged provision must 'unreasonably favor' the party asserting it." *Denlinger, Inc. v. Dendler*, 415 Pa.Super. 164, 177, 608 A.2d 1061 (1992). *See, e.g.*, *Snyder v. Rogers*, 346 Pa.Super. 505, 509, 499 A.2d 1369 (1985); *Germantown Mfg. Co. v. Rawlinson*, 341 Pa.Super. 42, 55–56, 491 A.2d 138 (1985); *Bishop v. Washington*, 331 Pa.Super. 387, 399–400, 480 A.2d 1088 (1984). "Unconscionability ... [does] nothing more than reaffirm the most basic tenet of the law of contracts—that parties must be free to choose the terms to which they will be bound." *Germantown Mfg.*, 341 Pa.Super. at 56, 491 A.2d 138.

An approach to analyzing a contractual situation for the existence of unconscionableness often utilized by Pennsylvania courts is that articulated by a commentator on the law of contracts:

> Parties to a contract rarely consciously advert to any number of terms which are binding upon them. If such terms allocate the risks of the bargain in a manner which the parties should have reasonably expected, they are enforceable—they are, to use the expression of Karl Llewellyn, "decent" terms. If the terms of the contract suggest a reallocation of material risks, an attempted reallocation may be so extreme that regardless of apparent and genuine assent, a court will not enforce it. . . . The parties will not be found to have agreed to an abnormal allocation of risks if the only evidence thereof is an inconspicuous provision in the boilerplate of the standard form. At a minimum, the reallocation must be physically conspicuous. Beyond that, it must have been manifested in a fashion comprehensible to the party against whom it is sought to be enforced. Finally, such party must have had a reasonable choice in relation to such reallocation.

*Germantown Mfg.*, 341 Pa.Super. at 56–57, 491 A.2d 138 (quoting John E. Murray, Jr., *Murray on Contracts* § 353 (2d ed.1974)) (ellipsis in original); *see also Campbell Soup Co. v. Wentz*, 172 F.2d 80 (3d Cir.

**13.** Previously, Option One suggested that common law unconscionability may not be raised affirmatively, only defensively, and thus cannot serve as a cause of action. I found that contention unpersuasive for a number of reasons.

First, to the extent that state law governs the issue, the Pennsylvania Supreme Court has not so determined. *Witmer v. Exxon Corp.*, 495 Pa. at 551, 434 A.2d 1222 ("Because we conclude, however, that the clauses here in question are neither unconscionable as written nor as applied, we need not reach the more general questions surrounding appellants' attempted use of the doctrine."). Moreover, other state court decisions have permitted the issue to be raised affirmatively. *See, e.g., Anoushian v. Rent–Rite, Inc.*, 2002 WL 1023438, at *5 n. 13.

Second, to the extent that an unconscionable contract under state law represents a UTPCPL violation, the issue is immaterial.

Third, as Option One has filed a secured proof of claim in this case, the issue of unconscionability could be raised as an objection to that claim. *See In re Elkins–Dell Manufacturing Co., Inc.*, 253 F.Supp. 864 (E.D.Pa.1966); *In re Metal–Built Products, Inc.*, 3 B.R. 176 (Bankr.E.D.Pa.1980); *see also* 3 *Collier on Bankruptcy* ¶ 502.02, at 502–25 (15th ed. rev. 2004).

1948); *Moscatiello v. Pittsburgh Contractors Equipment Co.*, 407 Pa.Super. 363, 373–74, 595 A.2d 1190 (1991).

■ The burden of establishing the unconscionable nature of a contract or contract provision clearly rests upon the party challenging the contract or term. *Denlinger, Inc. v. Dendler*, 415 Pa.Super. at 175, 608 A.2d 1061; *Bishop v. Washington*, 331 Pa.Super. at 399, 480 A.2d 1088. *See also Argo Welded Products, Inc. v. J.T. Ryerson Steel & Sons, Inc.*, 528 F.Supp. 583, 593 (E.D.Pa.1981) ("[The challenger] bears a heavy burden in sustaining its claim that the limitation of liability provision is unconscionable.").

While the precise standard by which this burden is successfully met is undefined by Pennsylvania courts, state court decisions apparently recognize the similitude between "unconscionability" and "fraud," at least as between parties of unequal bargaining positions. *See, e.g., Germantown Mfg.*, 341 Pa.Super. at 56, 491 A.2d 138. To the extent the plaintiffs allege that the defendant acted fraudulently, either under common law or in violation of the UTPCPL, the burden of proof is clear and convincing evidence. *See, e.g., Weisblatt v. Minnesota Mut. Life Ins. Co.*, 4 F.Supp.2d at 377.

Should a court find that a contract or any of its provisions are unconscionable, then it may refuse to enforce that contract or term. *E.g., Moscatiello v. Pittsburgh Contractors*, 407 Pa.Super. at 376, 595 A.2d 1190 (affirming trial court's refusal to give effect to unconscionable provisions in a contract); *Snyder v. Rogers*, 346 Pa.Super. at 512, 499 A.2d 1369 (declining to enforce an unconscionable contract as against public policy).

■ In Pennsylvania, it is difficult for a party to a written contract to successfully argue that he or she should be freed from the terms of the contract due to unfairness. It is expected that parties will read contracts and if they sign them agree to be bound by their terms. *See, e.g., Schoble v. Schoble*, 349 Pa. 408, 411–412, 37 A.2d 604 (1944) ("A person of age is presumed to know the meaning of words in a contract, and if, relying upon his own ability, he enters into an agreement not to his best interests he cannot later be heard to complain that he was not acquainted with its contents and did not understand the meaning of the words used in the instrument which he signed."). This is true whether or not the complaining party took the trouble to actually read the agreement before signing. "Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains." *Simeone v. Simeone*, 525 Pa. 392, 400, 581 A.2d 162 (1990).

The plaintiffs' burden on these two claims is even heavier because they had a right to rescind the loan agreement, a right of which they were aware and elected not to exercise. It is difficult to argue that a contract is unconscionable—viz., entered into without meaningful choice—when the complaining party had the known right to cancel it. *See Fraser v. Nationwide Mut. Ins. Co.*, 135 F.Supp.2d 623 (E.D.Pa.2001), *remanded in part on other grounds*, 352 F.3d 107 (3d Cir.2003):

> With respect to the claim of unconscionability, plaintiff fails to respond to defendants' argument that the Agent's Agreement is not unconscionable because both parties held the right to cancel the contract at any time for any reason and both parties entered into the agreement with a full understanding of its effect. It is a firmly established principle of Pennsylvania law that one who enters a contract "should do so only after due

reflection of the possible consequences ... that could have been expected by a reasonably intelligent man," and "he cannot rely on the law to remedy his fecklessness." *New Charter Coal Co. v. McKee*, 411 Pa. 307, 191 A.2d 830, 833 (1963).

*Id.* at 646.

Nonetheless, in discussing the issue of common law unconscionability in connection with a loan transaction, the D.C. Circuit Court remanded a civil action to the trial court with this explanation:

Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction. In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power. The manner in which the contract was entered is also relevant to this consideration. Did each party to the contract, considering his obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print and minimized by deceptive sales practices? Ordinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain. But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms.

*Williams v. First Government Mortgage & Investors Corp.*, 225 F.3d 738, 748 (D.C.Cir.2000).

Furthermore, in *Besta v. Beneficial Loan Co.*, 855 F.2d 532 (8th Cir.1988), the Eighth Circuit concluded that a loan transaction, where the terms were disclosed to the borrower, was so unfair that it was unconscionable under Iowa's unfair trade practices statute. The appellate court noted that there were other, less expensive lending options, available from that very same lender that were not disclosed to the borrower. *Id.* at 535. As framed by the Eighth Circuit:

[W]e are uncomfortable with the fact that a lender would call up a borrower at home, tell her he could get her the money she needs, and then set up a loan that is exorbitantly expensive while failing to tell her that she could get everything she wants for less money and at a lower monthly payment.

*Id.* at 536.

Thus, there may be very narrow factual circumstances in which a loan transaction is unconscionable despite written disclosure of its terms, *see* 73 P.S. § 201–2(4): other information known to the lender was not disclosed; and had such information been disclosed to the borrower, the transaction was one into which no reasonable person would enter because it was grossly unfair. *See In re Milbourne*, 108 B.R. at 537; *see generally In re Lewis*, 290 B.R. 541, 557 (Bankr.E.D.Pa.2003); *In re Maxwell*, 281 B.R. 101 (Bankr.D.Mass.2002). I shall now consider whether the plaintiffs here have met this difficult standard established under state law.

### B.

For the following reasons, I conclude that the plaintiffs did not introduce sufficient evidence to meet their burden on counts V and VI.

In essence, the plaintiffs complain that all aspects of this loan transaction were structured by the defendant to maximize its fees and finance charges, and that such fees were hidden from their discovery. They assert the following: The plaintiffs

sought a relatively small loan and ended up refinancing their home mortgage for a much larger sum. They received about half the cash they needed for their intended home remodeling project. They paid up-front fees almost equal to the cash proceeds they received. The vast majority of the loan proceeds were used, at the defendant's direction, to satisfy a fixed-rate mortgage loan, which loan was then replaced with a riskier variable-rate mortgage. The loan transaction substituted a fixed monthly mortgage payment they could afford for a larger one that, they contend, is too expensive for their budget. They were only made aware of the loan terms at the last minute and had no real opportunity to review, consider and understand the documents they were signing. They were financially unsophisticated and relatively uneducated borrowers who were not high credit risk individuals, and who were misled and taken advantage of by a sophisticated lender.

Some of these averments were proven; however, some were not. For example, as noted earlier in the findings of fact, I conclude that it is likely that the plaintiffs received an advance loan disclosure package that, if reviewed, would have provided them with information about the refinancing structure of the proposed loan prior to the closing, as well as to the variable interest rate.[14] These documents revealed, *inter alia*, an amount financed of $52,203.44, 360 monthly payments, and an APR of 10.581%, Ex. Tab–6, at D0193; estimated closing costs of $5,189.56,[15] *id.* at D0191; and an appraisal fee of $350, *id.* at D0194.

These disclosures also provided an explanation of adjustable rate mortgages. *Id.* at D0197.

■ Not only does the evidence not support the plaintiffs' argument that the material loan terms were hidden from them until the last second, the evidence also supports the defendant's contention that the plaintiffs were remiss in discovering information readily available. For example, when orally notified that a loan had been approved and a closing date needed to be established, Mrs. Strong just assumed the loan was for $10,000. She did not bother to ask about the loan amount, interest rate or even the monthly payment amount. *See* 1 N.T. at 59. Despite their prior experience the year before with the ContiMortgage refinancing, *see* 1 N.T. at 88, Mrs. Strong did not inquire whether the defendant's loan offer involved refinancing the first mortgage or would be a second mortgage. *See id.*

In addition, at the closing, Mrs. Strong admits she did not ask many questions: "never thought to." *Id.* at 65. Although she knew the monthly payment amount of the defendant's loan, she testified that she did not appreciate that her monthly mortgage payments would increase with this loan even though the total amount of her debt was increasing. *Id.* at 87. She did not question the loan application she was then signing that recited a $52,800 loan at 8.4% for 360 months, even though she allegedly expected a $10,000 loan. *Id.* at 113; *see* Ex. Tab–35.[16]

---

**14.** In this discussion I focus only on whether the plaintiffs received the disclosure package asserted by the defendant as sent. Whether the disclosures sent complied with the TILA or HOEPA will be discussed later.

**15.** Among other fees, the Good Faith Estimate of Settlement Costs disclosed the following estimated costs to be paid by the borrower:

$350 appraisal fee, $763 title insurance fee, $100 courier fee, $50 recording fee, and the $15 flood search fee.

**16.** Due to a misplaced decimal point, the plaintiffs' unpaid balance on the ContiMortgage loan appeared on the Loan Application as $4,132,600.00 rather than as $41,326.00. Ex. Tab–35.

Unfortunately, this lack of attention to financial details concerning the Option One mortgage was not unique. Mrs. Strong could not recall how she obtained the loan from ContiMortgage or whether the closing was held at her house, *id.* at 140, whether an appraiser came to her house, *id.* at 142, what interest rate was charged by ContiMortgage, *id.* at 80, what the amount of the earlier loan was or what she used the proceeds for. *Id.* at 141 ("We wanted to take trips or something."). When asked at trial the reason for agreeing to a $40,000 loan with ContiMortgage in order to have funds for a vacation, Mr. Strong appeared not to understand that the July 1998 loan refinanced an existing mortgage: "No, I don't understand how we got to that point with the $40,000. I think that's how the other mortgage company gave us the loan and then it built up to $40,000." *Id.* at 192.

To the extent the plaintiffs either did not know or did not understand the full effect of the Option One loan transaction in May 1999, there is no evidence that such confusion was intended or designed by the defendant. For instance, Mr. Strong professed uncertainty at trial when asked whether he understood that the ContiMortgage loan had been satisfied by the May 1999 loan proceeds. He testified that he thought it was "unusual" that he was not billed by ContiMortgage after the May 1999 closing, but neither he nor his wife made any inquiry of that lender. *See id.* at 168–69. In fact, when questioned whether he thought, when he signed the loan documents, that he would have to pay ContiMortgage its normal $300 a month payment as well as pay Option One about $400 a month, Mr. Strong replied "I really didn't have the slightest idea. We didn't— I didn't think to talk to my wife about that or . . . ." *Id.* at 187. Yet, he understood that he could not have afforded to pay $700 per month. *Id.*

Mr. Strong testified that he signed the deed transferring title of the property from himself to both he and his wife jointly merely because "[t]hat's what [the title closer] asked for." *Id.* at 163. He did not ask the title closer any questions. *Id.* at 183. Mr. Strong also stated that neither he nor his wife asked about a coupon book. *Id.* at 186.

The plaintiffs attribute their confusion to the defendant's practices and their lack of sophistication and education. But the plaintiffs appeared at trial to be reasonably intelligent and conscientious individuals. They have both been steadily employed. Mr. Strong is a military veteran. I also appreciate that borrowers rarely thoroughly read every document set before them in a closing. But these plaintiffs appear to have made little effort to read the loan documents or question the loan closer either before signing or before the expiration of the three-day cancellation period. *See id.* at 107 (Mr. Sullivan: And you read most of the stack of papers, is that right? Mrs. Strong: No.). Mr. Strong admitted "[t]here's a lot of documents me and my wife didn't read and we should have." *Id.* at 175.

Mrs. Strong did ask a few questions at the loan closing, learning the monthly payment amount, *id.* at 116, 118, 128; the first and last payment date, *id.* at 116; the number and amount of payments beginning July 1, 2001, *id.* at 119; and the amount of the final payment, *id.* Unfortunately, the plaintiffs elected not to ask about other loan provisions they now complain are unfair, or to review the documents that would reveal those terms.

In addition, after the loan closing, and in the comfort of their own home, the plaintiffs chose not to review the documents, knowing that the proceeds fell short of their request, *id.* at 63, 87, and knowing

that they could cancel the loan transaction, *id.* at 65.

For example, the plaintiffs specifically complain about not understanding that their loan included an adjustable rate. But the adjustable rate term was far from hidden from them, as its provisions were described in several forms with full explanation of its characteristics: explanation of the adjustable rate was provided on the Adjustable Rate Note itself, Ex. Tab–40, as well as on the Adjustable Rate Rider, Ex. Tab–38, both signed by the plaintiffs at closing; a document titled Adjustable Rate Mortgage Loan Program Disclosure, Ex. Tab–6, was provided to the plaintiffs in pre-closing disclosures; and, as the plaintiffs themselves pointed out, a description of adjustable rate mortgages is posted on the defendant's website, Ex. P–20. That the plaintiffs did not read any of these documents does not place culpability on the defendant. *See In re Roberson,* 262 B.R. 312, 322 (Bankr.E.D.Pa.2001) (citing *Dentsply Int'l, Inc. v. Benton,* 965 F.Supp. 574, 578 (M.D.Pa.1997) (duty to read contract before signing it)); *In re Jones,* 284 B.R. 92, 97 n. 5 (Bankr.E.D.Pa.2002) ("Pennsylvania law affords no leniency for individuals who do not read the contracts that they execute."), (quoting *Nelson Med. Group v. Phoenix Health Corp.,* 2002 WL 1066959 (Pa.Com.Pl.2002)); *see generally Johnson v. Banc One Acceptance Corp.,* 278 F.Supp.2d 450, 458 (E.D.Pa.2003) ("[T]hat the plaintiffs allegedly did not understand that they would be required to make a single payment of nearly sixty thousand dollars at the end of the term of their loan is unfortunate, but Bank One complied with the law."); *In re Williams,* 232 B.R. 629, 642 (Bankr.E.D.Pa.1999) ("It is also not required that the consumer understand the disclosures provided, but only that they be properly made pursuant to the terms of the TILA.").

Nonetheless, the plaintiffs allege that the defendant engaged in fraudulent, deceptive or unconscionable conduct by failing to explain the favorable or unfavorable terms of their loan—i.e., that the defendant took advantage of the fact that the plaintiffs "were unaware of the disadvantages and risks of refinancing and consolidating their pre-existing debt," and that the defendant failed to disclose that it would charge more for a refinance than for a second mortgage. *See* Complaint ¶¶ 40–42. This position was unproven at trial.

■■■■ First, the defendant held no affirmative duty to explain any terms to the plaintiffs. An omission of general information, on the other hand, is actionable "only where there is an independent duty to disclose the omitted information." *Weisblatt,* 4 F.Supp.2d at 379, (quoting *Estate of Evasew,* 526 Pa. 98, 105, 584 A.2d 910 (1990)); *compare Zwiercan v. General Motors Corp.,* 2002 WL 31053838, at *3–4 (Pa.Com.Pl. Sept.11, 2002) (duty to disclose material defects). "Pennsylvania courts have held that a lender is not a fiduciary of a borrower." *In re Johnson,* 292 B.R. 821, 828 (Bankr.E.D.Pa.2003). However, a fiduciary relationship may nonetheless arise where "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side or weakness, dependence or justifiable trust, on the other." *Id.* (citing *Destefano & Associates, Inc. v. Cohen,* 2002 WL 1472340, at *3 (Pa.Com.Pl. May 23, 2002)) (quoting *Commonwealth Dept. of Transp. v. E–Z Parks, Inc.,* 153 Pa.Cmwlth. 258, 268, 620 A.2d 712 (1993)). A confidential relationship may arise when there is "(1) a relationship of actual closeness; (2) a substantial disparity in the parties' positions; and (3) actual reliance by the settlor on the person in the position of trust." *Weisblatt,*

4 F.Supp.2d at 381 (citing *Clyde v. Hodge,* 460 F.2d 532, 535 (3d Cir.1972)). It may exist "whenever the relative position of the parties is such that one has power and means to take advantage of or exercise undue influence over the other." *Id.; see also Estate of Evasew,* 584 A.2d at 912. "After establishing that a fiduciary duty exists then the plaintiff must then [sic] show that a subsequent breach occurred." *Weisblatt,* 4 F.Supp.2d at 381; *see Becker v. Chicago Title Ins. Co.,* 2004 WL 228672, at *8 (E.D.Pa. Feb. 4, 2004) (same); *see generally In re Lewis,* 290 B.R. at 556 (no liability where debtor failed to allege basis for broker owing fiduciary duty).

As already related, the plaintiffs had some telephonic communication with the defendant prior to the closing and asked a few questions. These telephone calls and documents exchanged via mail or facsimile do not exhibit the "relationship of actual closeness" that is meant to "inspire confidence that [the defendant] was bound to act for the benefit of [the plaintiffs] and (could) take no benefit for [itself]." *Weisblatt,* 4 F.Supp.2d at 381 (internal citations omitted). *See, e.g., In re Estate of Clark,* 467 Pa. 628, 635, 359 A.2d 777 (1976) (confidential relationship where donor in weakened mental condition depended on donee in financial dealings, and donee controlled donor's business affairs). To a certain extent, the plaintiffs' complaint about lack of communication from the defendant undermines any assertion of a confidential relationship with this lender.

In addition, the plaintiffs did not establish evidence supporting a finding of "overmastering dominance" by Ms. Stevens, the loan closer. *See In re Johnson,* 292 B.R. at 829 (doubting that Pennsylvania law would recognize a fiduciary duty between a title company and a borrower where the relationship was more attenuated than lender-borrower). The plaintiffs mainly complained that the loan closer sped them through signing the documents. Given their home setting, given that they had entered into a similar loan transaction previously, given their right of cancellation, and given that they felt comfortable enough to ask some questions during the closing, no fiduciary relationship arose.

Further, the disparity in the parties' positions is not as great as the plaintiffs' allege. Though they lack formal education beyond earning GEDs, the plaintiffs were not new to financing—indeed, they refinanced their home mortgage merely one year before, the $40,800 loan with Conti-Mortgage, *see* 1 N.T. at 88—and knew they had the ability to rescind the Option One loan, *id.* at 65. Thus, they probably understood that loans come in different shapes and sizes with differing amounts, lengths and interest rates; and they knew or should have known that they had the opportunity to refuse any offered loan or to promptly cancel one previously agreed to. Under these circumstances, Pennsylvania law placed no duty on the defendant to explain the loan terms and their relative benefits and detriments to these borrowers.

By way of comparison, the *Weisblatt* court held that no confidential relationship arose between a purchaser of insurance and her insurance agent where an insurance agent had twice met with the purchaser in her home. 4 F.Supp.2d at 381. The purchaser alleged that the agent did not explain different options of life insurance or provide exactly what the purchaser wanted. *Id.* at 375.

The *Weisblatt* court held that the relationship between the insurance agent and the purchaser reflected "the quintessential arm's-length relationship, that of seller and buyer," 4 F.Supp.2d at 381, rather than a confidential relationship. The court reasoned that

a reasonable buyer of insurance (or any other product) must, at peril of *caveat emptor*, act as a reasonable consumer, *e.g.*, research her needs from multiple sources and price-shop for policies. While a good insurance agent will pay careful attention to the insured's needs in structuring a proposed policy, he does so not out of a special duty to act to the consumer's exclusive benefit, but rather out of a duty to his employer—and to his own self-interest—to sell its products as successfully as possible.

*Id.* at 382.[17]

The same sort of buyer-seller relationship existed here. The plaintiffs merely requested a loan from the defendant and the defendant sent a proposed loan offer. Clearly, such an offer was designed to profit the lender. Thereafter, the plaintiffs did not act as careful consumers, but accepted the offer despite being aware of certain terms they now contend are unfavorable—i.e., the cash proceeds; the monthly payment amount—and despite their failure to discover the provisions of other loan terms.

The plaintiffs should have anticipated that, despite requesting a loan for a certain amount, the lender might propose to refinance all of the borrower's current lien debt, since that happened with the Conti-Mortgage loan less than one year earlier. *See* 1 N.T. at 88. That does not mean that they understood all the disadvantages and risks of refinancing; but it undermines their contention that they would not have chosen refinancing had they been aware the transaction was so structured.

Indeed, by the end of the closing, the plaintiffs were clearly aware that they had entered into a loan transaction different from the one they originally sought:

> Mr. Strong: We did—she did mention something about the reason why we couldn't get the $10,000, but I wasn't really paying attention, so this is the check that she gave us for 52. She said this is all we can get. And then me and my wife, we paused, for a minute we looked at each other, and then we said, Well, we—we talked about it—we said, Well, we can start the kitchen with this, you know, that we'd make the monthly payment with our check.
>
> The Court: Yes, when you spoke about it with your wife, was Ms. Stevens still in the house or had she gone by then?
>
> Mr. Strong: She had left.

*Id.* at 185. By not rescinding when aware that they could, they accepted the terms of the loan as proposed by the defendant.

The plaintiffs did not present evidence that the defendant engaged in the type of unconscionable or deceptive practices described in *Milbourne*, 108 B.R. at 535, where the lender refinanced or "flipped" the borrower's loan five times within a twenty-one month period. The *Milbourne* court found that the lender engaged in "opportunistic" and "unfairly deceptive" conduct constituting a violation of the UTPCPL's catchall provision. *In re Milbourne*, 108 B.R. at 535. Nor do their allegations resemble the conduct described by the *Milbourne* court of the lender in *In re Tucker*, 74 B.R. 923, 925–27 (Bankr. E.D.Pa.1987), which refinanced a debtor's original loan twice. *In re Milbourne*, 108 B.R. at 535. For one, the lender/defendant here only refinanced the debtor's loan originated with another lender. In addition, the plaintiffs did not compare the

---

17. In contrast, the Truth in Lending Act reflects "a transition in congressional policy from a philosophy of 'Let the buyer beware' to one of 'Let the seller disclose.'" *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 377, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973).

costs incurred by refinancing with those they would have incurred had they obtained a second mortgage. *See id.* at 536. Without proving that there were options available to them that would have significantly decreased their costs in obtaining credit, I cannot find that a refinancing, *per se,* is either grossly unfair so that it is unconscionable or an unfair trade practice under state law.

The plaintiffs may not have been able to obtain better loan terms from the defendant. *Compare Besta v. Beneficial,* 855 F.2d at 535 (loan transaction was unconscionable where there were other, less expensive, lending options available from the very same lender that were not disclosed to the borrower). However, they could have refused Option One's offer and applied to another lender. (No evidence was offered about the plaintiffs approaching ContiMortgage for additional funds.) They could have elected not to borrow money at that time and delay their remodeling project. *See Weisblatt,* 4 F.Supp.2d at 382 n. 13 ("Failure by the consumer to exercise due care in the selection and purchase can affect the scope of the duties owed to her by an insurance broker."). Moreover, the plaintiffs presented no evidence that they were under any duress, legal or otherwise, to enter into the loan, as they testified the loan was sought to upgrade their kitchen—a project that could be delayed if they disapproved of the proposed loan terms.

Though Mrs. Strong testified that she did not think about rescinding because she wanted the kitchen work done, 1 N.T. at 139, no showing was made of exactly what the kitchen needed to evidence any pressure put on the plaintiffs to accept allegedly unfavorable loan terms.[18] On the contrary, Mr. Strong testified: "I guess I was more excited about getting the kitchen done. I was kind of naive. We should have just read everything." *Id.* at 187–88. Further, this was not a situation where the defendant traveled door-to-door, hoping to dupe persons who are uneducated, inexperienced and of low income—the plaintiffs contacted the defendant, allegedly after the receipt of a general advertising brochure, and received advance loan disclosures. *Compare In re Milbourne,* 108 B.R. at 536–37.

Here, the plaintiffs have compared the instant loan terms with those of the ContiMortgage loan obtained a year before. However, the loans were for different amounts and with different lenders not necessarily willing to take on the same risks. For example, comparison of the monthly payments is inconclusive considering that, having borrowed nearly $12,000 more in the instant loan, the monthly payments likely would increase. Moreover, Mrs. Strong admitted that her new monthly payment amount of $402 "sounded normal." 1 N.T. at 122.[19] Mr. Strong also admitted the monthly payment "was okay." *Id.* at 171.[20] *See In re Sheppard,*

18. The pre-loan appraisal report describes the kitchen as "new kitchen with new vinyl flooring." *See* Ex. D–18, at D0122. Although this report cannot substitute for a full description of the kitchen's status, it suggests that the kitchen was not in a decayed state, for example, non-functioning appliances, that prevented normal use. The plaintiffs did not suggest otherwise. *See* 1 N.T. at 51 (Mr. Berry: What did you want to get done in your kitchen? Mrs. Strong: Remodel the whole kitchen. Mr. Berry: What did you want to get done

specifically? Mrs. Strong: The floor, ceiling, walls cabinets. The whole kitchen.).

19. This statement was elicited during questioning by the court; on direct, Mrs. Strong had testified that she did not realize her payments would increase with this loan. 1 N.T. at 87.

20. The plaintiffs alleged that the transaction left them with a loan they were unable to pay; however, despite the new monthly payment

299 B.R. 753, 767, 769 (Bankr.E.D.Pa.2003) (lender not liable where the plaintiffs freely made the decision to enter into what was a bad loan agreement. "Their acceptance of the terms of the Modification reflects their lack of leverage with GMAC not misrepresentations about the terms of the Modification.").

Though the plaintiffs complain about the replacement of ContiMortgage's fixed interest rate of 8.9% with a variable rate, that variable rate began at 8.4%, half a percentage point lower than the replaced ContiMortgage rate, and was fixed at the lower rate for the first two years of the loan. *See* Ex. D–38. Although that the interest rate could rise to as much as 14.4%, the plaintiffs neglected to prove what percentage it in fact increased to in June 2001, the first time it would have changed (as well as the only time it would do so before the plaintiffs' bankruptcy filing on November 9, 2001).[21] *See Beneficial Mortgage Co. of Ohio v. Leach,* 2002 WL 926759, at *9 (Ohio Ct.App. May 9, 2002) (denying summary judgment to a mortgage company on a unconscionability claim where the interest rate increased from the 9% of borrower's prior mortgage to a rate starting at 14% and variable up to 21%). Admittedly, the Truth In Lending disclosure stated that the monthly payment would rise to $499.49 per month after the first two years, but that document merely estimated a future interest rate.

That the defendant's website may state that an adjustable rate is riskier than a fixed rate, and more commonly used when

the property may be resold shortly, does not prove that the inclusion of a variable rate provision in this case was unconscionable. As also noted on this website, a variable rate note can benefit certain borrowers:

> These loans tend to be riskier because the interest rate could increase. The advantage is that lower initial payments may make it easier for buyers to qualify. These loans tend to benefit borrowers that plan to either sell the property or refinance before reaching the adjustable period of the loan.

Ex. P–20. So, countering the risk of a variable rate loan is the benefit of beginning with a low payment and the benefit of a lower rate if the loan will be repaid in a few years, via a sale of the realty, or by refinancing.

Finally, the parties stipulated that the defendant required the plaintiffs to refinance the ContiMortgage loan so that the defendant could obtain first lien status. *See* Plaintiffs' Memorandum of Law § III.A.2.a.i., at ¶ 6. Though this arrangement certainly favors the defendant, I do not believe the partiality is grossly unfair. For one, I note that ContiMortgage also imposed the same requirement—repaying the prior Parkway mortgage—suggesting the requirement is not unusual among lenders of this type. The defendant did not take advantage by refinancing all of the plaintiffs' debts, only paying off those debts that would prevent the defendant

---

amount (which they testified "sounded normal"), the plaintiffs also managed to tender payments to the contractor for their kitchen work.

**21.** The defendant's Proof of Claim provides a glimpse of the increased rate, reciting an interest rate of 10.125% as of November 9, 2001. Ex. P–40. Though the plaintiffs put the Proof of Claim into evidence, they did not

point to the increased interest rate in their arguments.

The parties stipulated to the total payments made by the plaintiffs from 1999 to 2002, but since the parties broke down the payments by year, not month, it is impossible to determine what the monthly payment was after June 2001.

from obtaining first lien status. *See* Ex. P–23.

In addition, the testimony of the defendant's witness, Ms. Anne Helder, suggests the plaintiffs were offered terms the defendant considered appropriate to their financial circumstances. Ms. Helder noted several pros and cons of their financial situation: after reviewing the loan file she testified that Mr. Strong probably would not have qualified for a loan based solely upon his income, 1 N.T. at 270; the plaintiffs were assigned a risk grade of AA, which was the second best risk for the particular loan program the plaintiffs were put into, *id.* at 203; the plaintiffs probably were offered a variable rather than a fixed interest rate because the plaintiffs actually paid their mortgage well, and the adjustable rate was probably better than the fixed rate, but also to get their credit straightened out, *id.* at 208; and they may have been better able to qualify for a variable rate loan than a fixed rate one, *id.* at 209. As for the loan proceeds not reaching the $10,000 the plaintiffs allegedly requested, as mentioned earlier, the loan was limited to 80% of the $66,000 appraised value of their home.

The plaintiffs therefore did not meet their burden of proof that the loan was grossly unfair to them or that they were misled or deceived. Thus, the defendant did not act unconscionably or commit any unfair trade practice in extending the loan. Accordingly, judgment shall be entered in favor of the defendant on counts V and VI of the complaint.

## V.

▮▮▮ In Count II, the plaintiffs allege that the defendant violated the Home Ownership and Equity Protection Act (15 U.S.C. §§ 1639 *et seq.*) ("HOEPA"), by failing to provide certain loan disclosures to the borrower "not less than 3 business days prior to consummation of the transaction" pursuant to 15 U.S.C. § 1639. The defendant maintains it supplied accurate TILA advance disclosures, but concedes that it did not give to plaintiffs the additional disclosures required by HOEPA. The defendant contends, however, that it was not required to provide these additional disclosures, because the mortgage loan transaction was not subject to any HOEPA requirements.

Section 1639 prescribes certain advance disclosures that a lender must provide to the borrower.[22] Such disclosures are required only when the loan transaction falls within the scope of 15 U.S.C. § 1602(aa)—

---

22. The required disclosures are specified in section 1639(a):

(1) Specific disclosures
In addition to other disclosures required under this subchapter, for each mortgage referred to in section 1602(aa) of this title, the creditor shall provide the following disclosures in conspicuous type size:
 (A) "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application."
 (B) "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan."

(2) Annual percentage rate
In addition to the disclosures required under paragraph (1), the creditor shall disclose—
 (A) in the case of a credit transaction with a fixed rate of interest, the annual percentage rate and the amount of the regular monthly payment; or
 (B) in the case of any other credit transaction, the annual percentage rate of the loan, the amount of the regular monthly payment, a statement that the interest rate and monthly payment may increase, and the amount of the maximum monthly payment, based on the maximum interest rate allowed pursuant to section 3806 of Title 12.

*i.e.,* involves a "HOEPA loan." Section 1602(aa) provides:

> (1) A mortgage referred to in this subsection means a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if—
>
> \* \* \*
>
> (B) the total points and fees payable by the consumer at or before closing will exceed the greater of—
>
> > (i) 8 percent of the total loan amount; or
> >
> > (ii) $400.[23]

*See also* 12 C.F.R. § 226.32(a)(1)(ii).

"In order for a loan to qualify as a mortgage loan within the definition of 15 U.S.C. § 1602(aa) (*i.e.,* HOEPA loan), a mortgage loan must satisfy five requirements." *Cunningham v. EquiCredit Corp. of Illinois,* 256 F.Supp.2d 785, 792 (N.D.Ill. 2003). Those five elements are as follows:

> First, the mortgage loan must be a "consumer credit transaction," as defined in 15 U.S.C. § 1602(h). Second, the mortgage loan must be a consumer credit transaction with a "creditor," as defined in 15 U.S.C. § 1602(f). Third, the mortgage loan must be secured by the "consumer's principal dwelling," as defined with reference to the definition of "dwelling" in 15 U.S.C. § 1602(v). Fourth, the mortgage loan must be a second or subordinate residential mortgage, not a "residential mortgage trans-

action," a "reverse mortgage transaction," or a transaction under an "open credit plan." Fifth, the mortgage loan must satisfy either of two tests set forth in 15 U.S.C. § 1602(aa)(1). The first test applies when the annual percentage rate of interest for the loan transaction exceeds certain levels. *See* 15 U.S.C. § 1602(aa)(1)(A). The second test applies when the total "points and fees" payable by the borrower at or before closing will exceed the greater of—(I) 8 percent of the total loan amount; or (ii) $400.

*Lopez v. Delta Funding Corp.,* 1998 WL 1537755, at \*5 (E.D.N.Y. Dec.23, 1998) (footnotes omitted).

There is no controversy that the first four HOEPA requirements are applicable to the instant loan transaction. What is in dispute concerns only the fifth element. The plaintiffs here argue that the total points and fees for this loan, if properly calculated, exceed 8% of the loan amount. The defendant contends to the contrary.

The phrase "points and fees" is also a defined term. Section 1602(aa)(4) provides the following definition:

> (4) For purposes of paragraph (1)(B), points and fees shall include—
>
> > (A) all items included in the finance charge, except interest or the time-price differential;
> >
> > (B) all compensation paid to mortgage brokers;
> >
> > (C) each of the charges listed in section 1605(e)[24] of this title (except an

---

**23.** The $400 floor is adjusted annually in light of the Consumer Price Index in effect on the preceding June 1st. In 1999, the year of the mortgage transaction, the figure was adjusted to $441. In 2004, the figure was adjusted to $499. *See* Official Staff Commentary to 12 C.F.R. § 226.32. There is no dispute that the 8% test is the relevant one in this proceeding,

as the points and fees far exceed the $441 floor.

**24.** Section 1605(e) provides:

> Items exempted from computation of finance charge in extensions of credit secured by an interest in real property. The following items, when charged in connection with any extension of credit secured by

escrow for future payment of taxes), unless—

(i) the charge is reasonable;

(ii) the creditor receives no direct or indirect compensation; and

(iii) the charge is paid to a third party unaffiliated with the creditor; and

an interest in real property, shall not be included in the computation of the finance charge with respect to that transaction:

(1) Fees or premiums for title examination, title insurance, or similar purposes.

(2) Fees for preparation of loan-related documents.

(3) Escrows for future payments of taxes and insurance.

(4) Fees for notarizing deeds and other documents.

(5) Appraisal fees, including fees related to any pest infestation or flood hazard inspections conducted prior to closing.

(6) Credit reports.

15 U.S.C. § 1605(e).

**25.** 12 C.F.R. § 226.4(a), (b) states:

(a) Definition. The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.

(1) Charges by third parties. The finance charge includes fees and amounts charged by someone other than the creditor, unless otherwise excluded under this section, if the creditor:

(i) requires the use of a third party as a condition of or an incident to the extension of credit, even if the consumer can· choose the third party; or

(ii) retains a portion of the third-party charge, to the extent of the portion retained.

(2) Special rule; closing agent charges. Fees charged by a third party that conducts the loan closing (such as a settlement agent, attorney, or escrow or title company) are finance charges only if the creditor:

(i) Requires the particular services for which the consumer is charged;

(D) such other charges as the Board determines to be appropriate.

The corresponding regulation provides:

(1) For purposes of paragraph (a)(1)(ii) of this section, points and fees means:

(i) All items required to be disclosed under § 226.4(a) and 226.4(b),[25] except interest or the time-price differential;

(ii) Requires the imposition of the charge; or

(iii) Retains a portion of the third-party charge, to the extent of the portion retained.

(3) Special rule; mortgage broker fees. Fees charged by a mortgage broker (including fees paid by the consumer directly to the broker or to the creditor for delivery to the broker) are finance charges even if the creditor does not require the consumer to use a mortgage broker and even if the creditor does not retain any portion of the charge.

(b) Example of finance charge. The finance charge includes the following types of charges, except for charges specifically excluded by paragraphs (c) through (e) of this section:

(1) Interest, time price differential, and any amount payable under an add-on or discount system of additional charges.

(2) Service, transaction, activity, and carrying charges, including any charge imposed on a checking or other transaction account to the extent that the charge exceeds the charge for a similar account without a credit feature.

(3) Points, loan fees, assumption fees, finder's fees, and similar charges.

(4) Appraisal, investigation, and credit report fees.

(5) Premiums or other charges for any guarantee or insurance protecting the creditor against the consumer's default or other credit loss.

(6) Charges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay the charges in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation.

(7) Premiums or other charges for credit life, accident, health, or loss-of-income insurance, written in connection with a credit transaction.

(ii) All compensation paid to mortgage brokers;

(iii) All items listed in § 226.4(c)(7) [26] (other than amounts held for future payment of taxes) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor; and

(iv) Premiums or other charges for credit life, accident, health, or loss-of-income insurance, or debt-cancellation coverage (whether or not the debt-cancellation coverage is insurance under applicable law) that provides for cancellation of all or part of the consumer's liability in the event of the loss of life, health, or income or in the case of accident, written in connection with the credit transaction.

12 C.F.R. § 226.32(b)(1).

The Official Staff Commentary to Regulation Z § 226.32(a)(1)(ii) explains how to determine the total loan amount:

> For the purposes of the "points and fees" test, the total loan amount is calculated by taking the amount financed, as determined according to § 226.18(b), and deducting any cost listed in

§ 226.32(b)(1)(iii) and § 226.32(b)(1)(iv) that is both included as points and fees under § 226.32(b)(1) and financed by the creditor.

Regulation Z, in turn, provides that the "amount financed" is calculated by:

> (1) determining the principal loan amount or the cash price (subtracting any downpayment);
>
> (2) adding any other amounts that are financed by the creditor and are not part of the finance charge; and
>
> (3) subtracting any prepaid finance charge.

12 C.F.R. § 226.18(b). The *Lopez* court explains that "[t]he 'prepaid finance charge' is defined by the Official Staff Commentary to Regulation Z § 226.32(a) to include any portion of the 'finance charge,' as defined by Regulation Z § 226.4, paid by the consumer prior to or at closing or settlement." *Lopez*, 1998 WL 1537755, at *7.

Section 1602(aa)(4)(C) imposes a reasonableness assessment when determining whether any charges listed in section 1605(e) should be included as points and fees. *See* 15 U.S.C. § 1602(aa)(4)(C)(i)-(iii). The term "reasonable" has been de-

---

(8) Premiums or other charges for insurance *against* loss of or damage to property, or against liability arising out of the ownership or use of property, written in connection with a credit transaction.

(9) Discounts for the purpose of inducing payment by a means other than the use of credit.

(10) Debt cancellation fees. Charges or premiums paid for debt cancellation coverage written in connection with a credit transaction, whether or not the debt cancellation coverage is insurance under applicable law.

**26.** 12 C.F.R. § 226.4(c)(7) provides:

(7) Real-estate related fees. The following fees in a transaction secured by real property or in a residential mortgage transaction,

if the fees are bona fide and reasonable in amount:

(i) Fees for title examination, abstract of title, title insurance, property survey, and similar purposes.

(ii) Fees for preparing loan-related documents, such as deeds, mortgages, and reconveyance or settlement documents.

(iii) Notary and credit report fees.

(iv) Property appraisal fees or fees for inspections to assess the value or condition of the property if the service is performed prior to closing, including fees related to pest infestation or flood hazard determinations.

(v) Amounts required to be paid into escrow or trustee accounts if the amounts would not otherwise be included in the finance charge.

fined as whether the charge was for a service "actually performed," *In re Bell,* 309 B.R. 139, 151–52 (Bankr.E.D.Pa.2004), and whether "the disputed charges are comparable to the prevailing rates of the industry in the locality at the time of the transaction," *In re Crisomia,* 2002 WL 31202722, at *7 (Bankr.E.D.Pa., Sept. 13, 2002) (citing *Brannam v. Huntington Mortgage Co.,* 287 F.3d 601, 606 (6th Cir.)), *cert. denied,* 537 U.S. 1048, 123 S.Ct. 635, 154 L.Ed.2d 522 (2002) (quoting *In re Grigsby,* 119 B.R. 479, 487 (Bankr.E.D.Pa. 1990), *vacated on other grounds,* 127 B.R. 759 (E.D.Pa.1991)); *see also Johnson v. Know Financial Group, L.L.C.,* 2004 WL 1179335, at *6 n. 5 (E.D.Pa. May 26, 2004); *In re Bell,* 309 B.R. at 151–52. "Thus, if the creditor picks an 'expensive' third party and is receiving a rebate, there is some risk a hidden finance charge may be determined to exist." *In re Grigsby,* 119 B.R. at 488 (quoting R. Rohner, *The Law of Truth in Lending,* ¶ 3.03[2][a], at 3–30 to 3–31 (1984)).

Here, using only those prepaid finance charges the parties agreed should be deducted from the note principal,[27] totaling $3,739.80, the total loan amount equals $49,060.20, calculated as follows:

| | | |
|---|---|---|
| | Note principal | $52,800.00 |
| plus | amounts financed by creditor and not part of finance charge: | 0.00 |
| minus | prepaid finance charges: | |
| | Loan Discount Fee | 2,640.00 |
| | Tax Service Fee | 70.00 |
| | Loan Processing Fee | 495.00 |
| | Settlement/Closing Fee | 350.00 |
| | Prepaid Interest | 184.80 |

27. Plaintiffs' Memorandum ¶ 47.

28. Although the finance charge includes prepaid interest pursuant to 12 C.F.R. § 226.4(b)(1), 15 U.S.C. § 1602(aa)(4)(A) expressly excludes interest from the points and fees for purposes of determining qualification

| | | |
|---|---|---|
| | Total amount financed: | 49,060.20 |
| minus | costs listed in § 226.32(b)(1)(iii) and (iv) included in points and fees and creditor financed: | 0.00 |
| | Total Loan Amount | $49,060.20 |

For the HOEPA disclosures to have been required, the points and fees must exceed eight percent of the above total loan amount. *See generally In re Crisomia,* 2002 WL 31202722, at *9. Using the undisputed figures, eight percent of the total loan amount would equal $3,924.82. The $3,555 in undisputed points and fees does not exceed this threshold.[28]

The plaintiffs maintain, however, that certain other fees assessed in connection with this loan that appear on the HUD–1 Settlement Statement, Ex. P–11, must also be included. Those disputed fees are as follows:

| | |
|---|---|
| Title Insurance Premium (paid to GAC) | $546.75 |
| Appraisal Fee (paid to defendant) | 350.00 |
| Flood Search Fee (paid to defendant) | 15.00 |
| Title Insurance Endorsements (paid to GAC) | 150.00 |
| Satisfaction Fee (paid to GAC) | 32.00 |
| Courier Fee (paid to GAC) | 15.00 |
| Document Preparation Fee (paid to GAC) | 100.00 |

These disputed fees total $1,208.75. Added to the $3,555.00 in undisputed points and fees, the total comes to $4,763.75. Thus, including these charges changes the total loan amount calculation as follows:

| | | |
|---|---|---|
| | Note principal | $52,800.00 |
| plus | amounts financed by creditor and not part of finance charge | 0.00 |
| minus | prepaid finance charges: | |
| | Loan Discount Fee | 2,640.00 |

as a HOEPA loan. Therefore, the total points and fees here equals the sum only of the loan discount fee, tax service fee, loan processing fee and settlement/closing fee, whereas the prepaid interest is included in determining the finance charge for TILA purposes.

| | |
|---|---:|
| Tax Service Fee | 70.00 |
| Loan Processing Fee | 495.00 |
| Settlement/Closing Fee | 350.00 |
| Flood Search Fee | 15.00 |
| Satisfaction Fee | 32.00 |
| Courier Fee | 15.00 |
| Prepaid Interest | 184.80 |
| | |
| Total amount financed: | $48,998.20 |

minus costs listed in § 226.32(b)(1)(iii) and (iv) and included in points and fees and creditor financed:

| | |
|---|---:|
| Title Insurance Premium | 546.75 |
| Appraisal Fee | 350.00 |
| Title Insurance Endorsement | 150.00 |
| Document Preparation Fee | 100.00 |
| | |
| Total Loan Amount | $47,851.45 |

Now 8% of the total loan amount, $3,828.12, is greatly exceeded by the $4,763.75 total points and fees.[29] Thus, if the plaintiffs are correct in their challenges to the fees noted above, the loan agreement of May 1999 would be governed by HOEPA.

The two largest challenged fees involve the cost for the appraisal and the cost for title insurance. The plaintiffs concede that they cannot reach the 8% threshold, and so prevail in their HOEPA claim, unless one of these two large charges is included within points and fees. Plaintiffs' Post–Trial Memorandum ¶ III(A)(1)(b).

Title insurance and appraisal fees are included in the HOEPA definition of points and fees, unless they are reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor. 12 C.F.R § 226.32(b)(1)(iii). The plaintiffs here contend that these fees were unreasonable. The defendant maintains to the contrary.

In addition, the defendant makes an alternative argument. It contends that even

if these fees are found to be unreasonable, only that portion of the fee that is excessive should be included within the classification of points and fees. The plaintiffs' position is that if any portion of the fee is unreasonable, the entire fee must be so considered. Recent reported decisions support the defendant's contention.

In *Guise v. BWM Mortgage, LLC,* 377 F.3d 795 (7th Cir.2004), the Seventh Circuit reviewed a district court determination to include only the unreasonable portion of the title insurance fee in calculating whether the disclosed finance charge was within an allowable tolerance. At issue was the statutory provision that a disclosed finance charge in connection with a TILA rescission claim would be treated as accurate if it did not vary from the actual finance charge by more than one half of one percent of the total amount of credit extended. *See* 15 U.S.C. § 1605(f)(2)(A). Unreasonable fees must be included within the finance charge for TILA rescission purposes.

The appellate court rejected the plaintiffs' contention that the entire title insurance fee should be included in the finance charge with the following explanation:

This argument is problematic for at least two reasons. First, the Guises' suggested reading of 12 C.F.R. § 226.4(c)(7)(i) would create tension with the plain language of § 1605(e)(1), the section of TILA that the regulation seeks to implement. Section § 1605(e)(1) expressly excludes title insurance fees from computation of finance charges. To deny Clearwater credit for the portion of the $1145 that represents a reasonable fee for the title insurance and endorsements it provided

29. Again, although the finance charge includes interest pursuant to 12 C.F.R. § 226.4(b)(1), 15 U.S.C. § 1602(aa)(4)(A) ex-

pressly excludes interest from the points and fees calculation.

would render the § 1605(e)(1) exemption meaningless and would subject lenders to liability beyond TILA's sanction. Second, the Guises' approach artificially inflates the alleged finance charge of $544 by lumping it with the allegedly reasonable fee of $601 charged for the title insurance received. An allegedly partial overcharge does not convert the entire title insurance transaction into a finance charge, it only demonstrates that some amount of the fee was not eligible from exclusion from the finance charge computation.

*Guise* at 377 F.3d 795, 800–01; *accord, e.g., Walker v. Gateway Financial Corp.,* 286 F.Supp.2d 965, 966–67 (N.D.Ill.2003) (only the excess above the reasonable amount is treated as undisclosed finance charge).

Although the *Guise* court's conclusion involved the application of the TILA tolerance provisions, District [now Circuit] Judge VanAntwerpen, analyzing a HOEPA claim, recently adopted the *Guise* holding, concluding there was "no reason to treat differently the phrase 'reasonable'" used in Regulation Z as it applies to TILA and to HOEPA. *Johnson v. Know Financial Group, L.L.C.,* 2004 WL 1179335, at *8. In so holding, the District Court noted that "every court to have considered the issue [under the TILA] has reached this same result." *Id.* at *8.

As it is likely that the promulgators of Regulation Z intended to use the term "reasonable" consistently throughout the regulation, *see* H.R. Conf. Rep. No. 652, 103rd Cong.2d Sess. 147, 159 (1994); *see also Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932) ("Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning."), I agree with the holding of

*Johnson.* Therefore, only the unreasonable portion of a fee, if any is found, will be included in the points and fees for purposes of HOEPA.

While the *Johnson* decision supports defendant's position as to this aspect of reasonableness, it undermines it as to another aspect. The defendant asserts that a fee is reasonable so long as the borrower is charged the "lawful rate." Defendant's Post-trial Memorandum at 16–17. Since the plaintiffs were charged the basic rate for title insurance established in Pennsylvania, the defendant contends that this rate must be reasonable. In *Johnson,* however, the borrowers were charged slightly less than the basic rate. Nonetheless, the District Court found the rate charged unreasonable under HOEPA because the plaintiffs were eligible for the lower refinance rate. *Johnson,* 2004 WL 1179335, at *7.

██ Implicitly, therefore, the court in *Johnson* placed upon the lender the duty to charge the borrower the lowest rate for which he was eligible under Pennsylvania law. Thus, the concept of a reasonable rate is not limited to the lawfulness of the rate, as the defendant insists. *See also In re Bell,* 309 B.R. at 151–52. Conversely, reasonableness does not require a lender to utilize "the cheapest third-party service available to it anywhere;" instead, "whether the fee is reasonable [is determined] by the prevailing practices in the relevant market." *Brannam v. Huntington Mortgage Co.,* 287 F.3d at 606.

In determining whether costs and fees charged to a borrower are reasonable, the plaintiffs suggest that certain legislative history dictates that the creditor should bear the burden of persuasion:

The points and fees trigger includes certain fees listed in Section 106(e) of the TILA such as fees paid to a third

party for title examination, document preparation, credit reports, notary services, and appraisal, unless the charges meet three criteria. First, the charge must be reasonable. The Conferees intend that this provision shall be interpreted consistently with interpretations of the existing reasonableness standard necessary to exclude such charges from the finance charge under Regulation Z (§ 226.4(c)(7)). Second, the creditor must not receive direct or indirect compensation for such charges. Third, the fee must be paid to a third party unaffiliated with the creditor. As such information is readily available to the creditor, it is the creditor's burden to establish that any such charge meets these three criteria for exclusion.

H.R. Conf. Rep. No. 652, 103rd Cong.2d Sess. 147, 159 (1994), U.S.Code Cong. & Admin.News 1994, pp. 1977, 1988–89.

Generally a plaintiff bears the burden of proving its claims. *In re Patterson,* 263 B.R. 82, 89 (Bankr.E.D.Pa.2001) (in an adversary proceeding, plaintiff bears burden of proving by preponderance of evidence all elements of claims just as any plaintiff would in suit outside of bankruptcy). However, it is also recognized that the party with the greater access to facts may be assessed the burden of persuasion on an issue involving those facts:

The logic of allocation of the burden of proof is that it is necessarily placed on the party who has the most knowledge and best means of proof on a given issue at his disposal. *Compare In re New York City Shoes, Inc.,* 86 B.R. 420, 425 (Bankr.E.D.Pa.1988) (landlord has burden of proving his own diligent efforts to replace an errant tenant); *In re Crompton,* 73 B.R. 800, 808–09 (Bankr.E.D.Pa. 1987) (debtor has burden of proving that his own statement of income and expenses satisfies the requirement that all of this projected disposable income is being paid into a Chapter 23[sic] plan); and *In re Furlow,* 70 B.R. 973, 978 (Bankr.E.D.Pa.1987) (debtor has burden of proving the logic of his reasons for discriminating in his treatment of creditors). Clearly, the party having the most knowledge of computation of the late charges in issue here and the party upon which the burden of proof must therefore be placed is the Claimant.

*In re Burwell,* 107 B.R. 62, 67 (Bankr. E.D.Pa.1989) (quoting *In re Jordan,* 91 B.R. 673, 684 (Bankr.E.D.Pa.1988)); *see Green Tree Financial Corp.-Alabama v. Randolph,* 531 U.S. 79, 96, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) (where fairness so requires, burden of proof of a particular fact may be assigned to "party who presumably has peculiar means of knowledge" of the fact) (quoting 9 J. Wigmore, *Evidence* § 2486 (J. Chadbourn ed., rev. ed.1981)).

Here, as the defendant would have greater access to information about the prevailing market for title insurance costs and appraisal fees, it should bear the burden of proof as to their reasonableness. *See generally Brannam v. Huntington Mortgage Co.,* 287 F.3d at 606 ("Because defendant has produced evidence suggesting that $250 is a reasonable fee for document preparation in Western Michigan, and plaintiffs have not produced any evidence to the contrary, we agree with the district court that there is no genuine issue of material fact as to whether the fee was 'reasonable' as required by Regulation Z.").

A.

The plaintiffs challenge the $350 appraisal fee they paid at closing as unreasonably exceeding the $250–$275 purportedly charged by real estate appraisers in the Philadelphia region at the relevant

time. They attribute this excessive fee to the defendant's use of an appraisal management company, resulting in inclusion of overhead costs that, the plaintiffs argue, were unrelated to the actual cost of preparing an appraisal of the property.[30] Here, GAC, the real estate settlement services company and agent for title insurance used in this loan, arranged for an appraisal for the defendant by Tech Review Limited. 1 N.T. at 315. The defendant responded that the appraisal fee was reasonable compared to what other appraisal management companies charged.

Based upon the evidence, I find that use of an appraisal management company by a lending company with offices in Florida seeking an appraisal of Pennsylvania realty was reasonable, and that the fee charged by the defendant was comparable to the prevailing rates of the appraisal management company industry in the locality at the time of the transaction.

An appraisal fee, as one of the items listed in section 1605(e), is included in the points and fees unless the charge is reasonable, the creditor receives no direct or indirect compensation, and the charge is paid to a third party unaffiliated with the creditor. *See* 15 U.S.C. § 1602(aa)(4)(C),

12 C.F.R. § 226.32(b)(iii). The HUD–1 Statement shows that the appraisal fee was paid to H & R Block. Ex. Tab–44. However, in evidence is an invoice dated May 3, 1999 from GAC to H & R Block, noting an invoice amount of $350 for an appraisal of a single family residence, noting the plaintiffs' name and address, and stamped "PAID." [31] Ex. Tab–21. Therefore, it is undisputed that while the plaintiffs were charged $350 for an appraisal fee and while the settlement sheet indicated that the fee was being paid to H & R Block, this payment was merely reimbursement for the fee H & R Block was already obligated to pay to GAC for the appraisal. Accordingly, the creditor here received no direct or indirect compensation, the charge ultimately being paid to a third party unaffiliated with the creditor. *See generally Cooper v. First Government Mortgage and Investors Corporation,* 238 F.Supp.2d 50, 61 (D.D.C.2002); *In re Bell,* 309 B.R. at 151. The plaintiffs do not contend otherwise.

Therefore, the only issue posed by the plaintiffs is whether the appraisal charge was reasonable, thereby permissibly excluding it from the HOEPA calculation of

---

**30.** The plaintiffs initially complained in their post-trial brief that the defendant needed to disclose a breakdown of the fee charged by the appraisal management company. Plaintiffs' Post–Trial Memorandum ¶ III.A.2.b.ii. TILA, however, does not require such a itemization. 15 U.S.C. § 1638(a)(2)(B)(iii) (requiring itemization only of amount paid to third persons on consumer's behalf upon written request). In their response to the defendant's post-trial brief, the plaintiffs clarify this argument, arguing only that the defendant misstated the APR by not including the portion of the fee retained by the appraisal management company in the finance charge and points and fees. Plaintiffs' Response to Post–Trial Memorandum Filed by Option One Mortgage Corp. at I.C.

**31.** Also in evidence is an Order Confirmation dated April 26, 1999 from GAC to H & R Block, confirming the appraisal ordered for the plaintiffs' property. Ex. Tab–16. The appraisal type is noted as "COD Single Family Appraisal," suggesting that H & R paid GAC upon delivery of the appraisal. *Id.* In addition, in evidence is what appears to be an order form from H & R Block to GAC requesting the appraisal. *Id.* The option of "COD" is hand-circled rather than "BILL," again suggesting that H & R paid GAC upon delivery. *Id.* A GAC appraisal cover sheet apparently faxed to Sarah at H & R Block notes the $350 cost of the appraisal. Ex. Tab–17. A document titled "Closing Order Confirmation & Closing Costs," Ex. Tab–20, provided by GAC, notes a "$.00" cost for the appraisal.

points and fees pursuant to 15 U.S.C. § 1602(aa)(4)(C).

Both parties presented expert testimony at trial and entered their experts' reports into evidence. *See* Exs. Tab–52, Tab–53, P–1, P–2. Both experts were credible as to the issues they addressed: *i.e.,* the plaintiffs' expert, Mr. John Szymanski, testifying that the market rate for single family home appraisals in April 1999 was $250–275, 1 N.T. at 30; the defendant's expert, Mr. Daniel Dean, testifying that the market rate charged by appraisal management companies in April 1999 for such appraisal work was $300–350, 1 N.T. at 317, and most commonly was $325. 1 N.T. at 318.

Mr. Dean explained that an appraisal management company locates appraisers for out-of-town lenders. *Id.* at 316. The appraisal management company maintains databases of appraisers for whom it has verified qualification, license and insurance, as well as sample work conforming to the company's standards. *Id.* at 317. It "monitors and tracks appraisal orders, reviews completed work, and forwards completed appraisals to its clients." Ex. Tab–30 ¶ 6. He explained the utility of an appraisal management company as follows:

> They offer several services. For one, they relieve the lender of the burden of actually researching an appraiser in a particular location. Companies of this size are usually national and when you're dealing with a lender that does national lending, that's very important.

1 N.T. at 316. Mr. Szymanski, the plaintiffs' expert, similarly testified that appraisal management companies set up appraisals, review the work product of the appraiser, and then collect a fee from which they pay the appraiser. *Id.* at 36. He further testified that he most commonly saw appraisal management companies charge $290. *Id.* at 39–40.

Although Mr. Dean's $325 average is slightly higher than Mr. Szymanski's $290, "the relevant inquiry is not whether [the lender] has used the cheapest third-party service available to it anywhere, but whether the fee is reasonable given the prevailing practices in the relevant market." *Brannam,* 287 F.3d at 606. I am convinced by both experts' testimony that the use of an appraisal management firm by an out-of-state lender was reasonable under the circumstances and that the fee charged to the plaintiffs was comparable to the prevailing rate. *Compare In re Grigsby,* 119 B.R. at 488 (in contrast, citing case where double charges were neither bona fide nor reasonable); 2 *Res. Mort. Lend. State Reg. Man. North Eastern R.I.* § 2–4 (noting R.I. Department of Business Regulation's prohibition against use of appraisal management companies unless, *inter alia,* the fee charged does not exceed the "customary and reasonable fee for an appraisal performed without the use of an" appraisal management company). Therefore, I find the appraisal fee justifiably excluded from the points and fees.

### B.

The plaintiffs also challenge being charged the basic rate charged for a new title insurance policy. They argue that they should have been charged the refinance rate or the reissue rate, because they already obtained a title policy in connection with the ContiMortgage loan in 1998. The defendant responds that the basic rate was appropriate because the plaintiffs never provided a copy of the earlier title policy as required, thus precluding the reissue rate, and because there had been a change of title from Mr. Strong to himself and his wife, thereby precluding the refinance rate.

Just like the appraisal fee, title insurance is one of the items listed in section

1605(e); therefore it will be included in the points and fees unless the charge is reasonable, the creditor receives no direct or indirect compensation, and the charge is paid to a third party unaffiliated with the creditor. *See* 15 U.S.C. § 1605(e)(1); 15 U.S.C. § 1602(aa)(4)(C), 12 C.F.R. § 226.32(b)(iii). Like the appraisal, the defendant ordered title insurance through GAC. Ex. Tab–19. But in this case, the HUD–1 indicates $546.75 was paid to GAC, not to the defendant. Thus, I need determine only whether the charge was reasonable.

The parties stipulated that the Commonwealth Insurance Commissioner sets title insurance charges in Pennsylvania and discloses them in a Title Insurance Rate Manual. This manual establishes the marketplace and thus the "reasonable" rate for such insurance. *See Johnson v. Know Financial Group, L.L.C.*, 2004 WL 1179335 (accepting Rate Manual as representing the relevant market for title insurance rates). My inquiry then is to whether the defendant reasonably charged the plaintiffs the basic rate. *Id.*

As will be discussed later in the section of this opinion dealing with the document preparation fee, I conclude that the defendant acted reasonably in requiring that both plaintiffs be title owners of the realty. Accordingly, the plaintiffs would not be eligible for the lowest rate: the refinance rate. Regarding the reissue rate however, the defendant was in the superior position, vis-a-vis the plaintiffs, to know that this lower rate was available upon production of the plaintiffs' prior title policy.

The defendant was sufficiently familiar with the ContiMortgage loan to know that a July 1998 title policy existed: the HUD–1 form obtained by the defendant from ContiMortgage concerning that prior loan transaction clearly shows purchase of title insurance from Stewart Title Company ($469.75) plus endorsements ($150.00). Ex. Tab–34. The defendant also had notice that it could obtain a reissue rate for the plaintiffs by producing the title policy, as the title commitment offered by GAC stated: "In order to receive a reissue rate for title insurance, GAC requires a copy of the schedule A and B from the previous title insurance policy be faxed to our office." Ex. P–37.

Furthermore, the defendant conditioned the loan upon the plaintiffs' purchase of title insurance; and the defendant asserted a right to obtain such insurance through GAC and then seek reimbursement from plaintiffs' loan proceeds. (The plaintiffs were not afforded the option to obtain title insurance in their own.) In so doing, the defendant assumed the duty to the plaintiffs of advising the plaintiffs to provide the prior title policy to GAC in order to obtain the lower, reissue rate. *See Johnson v. Know Financial Group, L.L.C.* Therefore, the unreasonable portion of the title insurance charge, $54.67—the basic rate actually charged, $546.75, less the reissue rate that should have been charged, $492.08—should be included in the HOEPA points and fees calculus.

Including the unreasonable amount in the points and fees results in a new total loan amount and points and fees as follows:

| | | |
|---|---|---:|
| | Note principal | $52,800.00 |
| plus | amounts financed by creditor and not part of finance charge | 0.00 |
| minus | prepaid finance charges: | |
| | Loan Discount Fee | $ 2,640.00 |
| | Tax Service Fee | 70.00 |
| | Loan Processing Fee | 495.00 |
| | Settlement/Closing Fee | 350.00 |
| | Prepaid interest | 184.80 |
| | Total amount financed: | $49,060.20 |
| minus | costs listed in § 226.32(b)(1)(iii) and (iv) in- | |

cluded in points and fees and creditor financed:

Title Insurance (unreas.por-tion) $ 54.67

Total Loan Amount $49,005.53

Eight percent of this total loan amount now equals $3,920.44, still not exceeded by the $3,609.67 in points and fees. Thus I must look at the other disputed fees.

### C.

In addition to the appraisal and title insurance fee, the plaintiffs challenge the following fees not yet addressed:

| | |
|---|---|
| Courier Fee | $ 15 |
| Satisfaction Fee | 32 |
| Title Ins. Endorsement 9.0 | 100 |
| Title Ins. Endorsement 8.1 | 50 |
| Flood Search Fee | 15 |
| Document Preparation Fee | 100 |
| TOTAL | $312 |

All but the courier fee are charges identified in section 226.4(c)(7) of Regulation Z that can be excluded from the finance charge, so long as they are "reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor." 12 C.F.R. § 226.32(b)(iii). There is no dispute that all fees except for the flood search charge were paid to GAC, not the defendant. *See* Ex. Tab–44. Therefore, as with the appraisal fee and the title insurance, I need only consider whether these additional fees (except for the courier and flood search fees) were reasonable.

The plaintiffs contend that the defendants overcharged for the Title Insurance Endorsement 9.0. The plaintiffs are correct that the Rate Manual's stated charge for Endorsement 9.0 is "10% of the applicable basic or reissue rate with a minimum Charge of $75.00." Ex. Tab–24, Rate Manual ¶ 6.19. The plaintiffs were charged $100 for this endorsement. Ex. Tab–44. Ten percent of the reissue rate ($492.08) is less than the minimum charge of $75. Thus the plaintiffs were over-

charged by $25, and $25 will be included in the points and fees as the unreasonable portion of this fee.

The plaintiffs also challenge Title Insurance Endorsement 8.1 as duplicative of coverage already existing in the basic policy, comparing the language of the endorsement to language in the policy. They do not otherwise dispute the $50 charge as the market fee for this endorsement, and indeed the Rate Manual sets the fee at $50. Ex. Tab–24 ¶ 6.15. The defendant argues that the endorsement was purchased and included in the coverage provided and that the $50 charge is consistent with that set by the Rate Manual.

The face page of the title insurance policy indicates that Endorsement 8.1 was incorporated within the policy. Ex. Tab–23 at D0002. Title Insurance Endorsement 8.1 provides:

> This endorsement provides coverage to a lender by insuring the lien priority of the insured mortgage over those environmental protection liens recorded in the land records except with respect to environmental protection liens provided for by certain statutes identified in the endorsement.

Ex. D–24 ¶ 6.15. The plaintiffs allege that this endorsement coverage is duplicated in the policy by the following language:

> Further, this policy insures that future violation of any covenants, conditions and restrictions appearing in the public records, including any relating to environmental protection, will not result in a forfeiture or reversion of title and that there are no provisions therein under which the lien of the insured mortgage can be extinguished, subordinated or impaired.

Ex. Tab–23 at D0003.

It is not apparent that the two provisions provide identical coverage. En-

dorsement 8.1 appears to protect against existing environmental liens, while the latter policy language protects against future violations. Considering that the plaintiffs paid the correct amount for the endorsement, the endorsement appears from the face of the policy to have been included in the policy, and the provisions cited by the plaintiff do not appear duplicative, the endorsement fee is reasonable and therefore is not included the points and fees.

The plaintiffs also maintain that the mortgage satisfaction fee should be included in the points and fees because a charge for satisfaction of the same mortgage was already assessed against them in the ContiMortgage loan payoff figure. *See* Exs. P–17, Tab–31. If true, the plaintiffs were double-charged, and this duplicate fee would not be reasonable. A careful review of the evidence, however, reveals that the plaintiffs were not charged twice for recording a satisfaction of the same mortgage.

The plaintiffs are correct that the payoff total for ContiMortgage included a $34 fee for satisfaction of that mortgage. Ex. Tab–31. They overlook, however, that the Parkway mortgage was still of record when the title search was done by GAC on May 3, 1999, and the defendant was so informed. Ex. Tab–22. A handwritten notation on the title report noted "need c of s," *id.*, presumably referencing a required certificate of mortgage satisfaction in order to remove this recorded lien.

By letter dated May 10, 1999, ContiMortgage informed the defendant that the Parkway mortgage had been paid in full and that it would "be satisfied at the county/town clerk's office and sent to the customer after recording." Ex. Tab–33. Presumably, such a satisfaction would be recorded upon receipt of the requisite fee. The ContiMortgage payoff letter states that "[t]he satisfaction fee stated above is the Lender's best estimate of the actual cost to record the satisfaction of your mortgage." Ex. Tab–31.

Notably, the payoff letter pre-dated by approximately two weeks the May 10th notification to defendant that a satisfaction had yet to be filed for the Parkway mortgage. Without any evidence that the plaintiffs had been previously charged by ContiMortgage to satisfy the Parkway mortgage in July 1998—indeed, the ContiMortgage settlement sheet shows no fee charged for a mortgage satisfaction, only for recordation of a mortgage, *see* Ex. Tab–34, line 1201 (recording fee)[32]—no double-charging of mortgage satisfaction fees was proven. The plaintiffs were only charged for two mortgage satisfactions: the $34 charged by ContiMortgage as part of its payoff figure for satisfying its mortgage, and the $32 charged by the defendant for satisfaction of the Parkway mortgage. Ex. Tab–44.

Therefore the satisfaction fee was properly excluded from the points and fees.

The plaintiffs next challenge the courier fee on the basis that it was required by the lender. The defendant did not specifically address the courier fee, arguing instead that the fees alleged to be actually part of the points and fees do not add up to exceed the eight percent threshold.

As already stated, points and fees include "all items to be disclosed under § 226.4(a) and 226.4(b)." 12 C.F.R. § 226.32(b)(1)(I). Section 226.4(a)(1) states that the finance charge includes fees charged by third parties if the creditor

---

**32.** Whereas the Option One settlement sheet includes a satisfaction fee at Exhibit Tab–44 line 1205, the corresponding line on the ContiMortgage settlement sheet was left blank. Ex. Tab–34.

"requires the use of a third party as a condition of or an incident to the extension of credit" or "retains a portion of the third-party charge." 12 C.F.R. § 226.4(a)(1). The regulations contain a special rule for closing agent charges however:

> Fees charged by a third party that conducts the loan closing (such as a settlement agent, attorney, or escrow or title company) are finance charges only if the creditor:
>
> (i) Requires the particular services for which the consumer is charged;
>
> (ii) Requires the imposition of the charge; or
>
> (iii) Retains a portion of the third-party charge, to the extent of the portion retained.

12 C.F.R. § 226.4(a)(2). The Official Staff Commentary to Regulation Z addresses courier fees specifically:

> 4. Charges by Settlement Agents. Charges imposed on the consumer by a settlement agent (such as an attorney, escrow agent, or title company) are finance charges only if the creditor requires the particular services for which the settlement agent is charging the borrower and the charge for those services is not otherwise excluded from the finance charge. For example, a fee for courier service charged by a settlement agent to send a document to the title company or some other party is not a finance charge, provided that the creditor has not required the use of a courier or retained the charge.

12 C.F.R. pt. 226, Supp. I, § 226.4(a)4; 60 Fed.Reg. 16771, 16777 (April 3, 1995); *see Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 943 (7th Cir.1995); *Curtis v. Secor Bank*, 896 F.Supp. 1115, 1119 (M.D.Ala.1995).

Here, the defendant instructed the closing agent to return the loan package to it within 24 hours after signing the documents. Ex. Tab–41 ¶ 20. Ms. Helder also confirmed that the defendant would want the documents returned to it in Tampa, Florida, within 24 hours of the closing. 1 N.T. at 246. Though the courier fee was paid to GAC, Ex. Tab–44, I find that it was compelled by the defendant. *See Bank of New York v. Mann*, 2004 WL 1878293, at *5 (N.D.Ill. Aug. 18, 2004). Therefore, the $15 fee should have been included in the finance charge, and thus becomes a component of the HOEPA points and fees. *See id.* at *5; *Sagan v. Option One Mortgage Corp.*, 2004 WL 1660625, at *5 (N.D.Ill. July 26, 2004).

Next, the plaintiffs challenge the $15 flood search fee as being paid directly to the defendant. They cite 12 C.F.R. § 226.32(b)(1)(iii) for the proposition that the charge must be included in points and fees unless "the creditor receives no direct or indirect compensation in connection with the charge." They then argue that there is no evidence that the $15 fee, noted on the Settlement Statement, went anywhere but to the defendant. Exs. P–11, Tab–44.

The defendant argues that the regulations permit lenders to exclude a flood search fee from the finance charge. The Regulations provide:

> The following fees in a transaction secured by real property or in a residential mortgage transaction [are not finance charges] if the fees are bona fide and reasonable in amount: ... (iv) Property appraisal fees or fees for inspections to assess the value or condition of the property if the service is performed prior to closing, including fees related to pest infestation or flood hazard determinations.

12 C.F.R. § 226.4(c)(7)(iv).

However, "[15 U.S.C. § ] 1602(aa)(4)(C) brings these exempted Real Estate

Charges back into the finance charge for the purpose of determining 'points and fees' unless they are also: (1) reasonable, (2) the creditor receives no direct or indirect compensation, and (3) the charge is paid to an unaffiliated third party." *In re Crisomia*, 2002 WL 31202722, at *9.

The Settlement Statement recites that the flood search fee was payable to H & R Block Mortgage. Unlike the appraisal fee paid to the defendant, which clearly represented the reimbursement of a charge to be paid by the defendant, there was no evidence that this flood search fee was a similar reimbursement, or was otherwise paid to some third party. Accordingly, based upon the provisions of section 1602(aa)(4)(C), it appears the defendant received direct compensation in connection with this particular charge. Accordingly, the flood search fee was improperly excluded from the points and fees. *See Cooper v. First Government Mortg. and Investors Corp.*, 238 F.Supp.2d at 60–61.

Finally, I address the document preparation fee of $100, charged for preparation of the deed transferring title from Mr. Strong to both of the Strongs. Generally, this fee would be excluded from the finance charge, and from calculation of HOEPA points and fees, so long as it was reasonable, the creditor received no direct or indirect compensation, and the charge was paid to an unaffiliated third party. 15 U.S.C. § 1602(aa)(4)(C); 12 C.F.R. § 226.4(c)(7)(ii).

The document preparation fee was paid to GAC, not the defendant. *See* Ex. D–44. Thus, only if the fee is unreasonable can it be included within the points and fees.

The plaintiffs argue that there was no valid reason for the defendant to require a transfer of ownership, noting that Conti-Mortgage did not require such a transfer; therefore, they maintain that the fee to prepare the deed was unreasonable because it was unnecessary. The defendant counters that it reasonably required title in both of the mortgagors' names, and thus any charge for the drafting of a new deed effecting this transfer was justified. The parties stipulated that the defendant required the transfer as a precondition of the loan.

Upon consideration of the parties' contentions and the evidence presented, I conclude that the defendant's ownership requirement was reasonable. Requiring all obligors on a note secured by a mortgage to have an ownership interest in the collateral could reduce the risk of non-payment. One who does not have an ownership interest in a property may have less of an incentive to repay the mortgage loan. Here, Mrs. Strong's income in addition to Mr. Strong's was viewed by the defendant as needed for repayment. ContiMortgage may not have had the same lending condition because that earlier loan involved lower monthly payments.

Thus, I do not find the charge for preparation of a transfer deed unreasonable on these facts. As the plaintiffs base their argument on this ground, not that the document preparation fee itself was excessive, *see generally Brannam*, 287 F.3d at 606 (difficult to determine document preparation costs where prepared by the defendant's own employees), there is no basis to find that the fee was other than reasonable.

In conclusion, inclusion in the points and fees of the courier and flood search fees, and the unreasonable portions of the Title Endorsement 9.0 and the Title Insurance fees, results in a new total loan amount and points and fees as follows:

| | | |
|---|---|---|
| Note principal | | 52,800.00 |
| plus | amounts financed by creditor and not part of finance charge | 0.00 |

minus prepaid finance charges:

| | |
|---|---|
| Loan Discount Fee | $ 2,640.00 |
| Tax Service Fee | 70.00 |
| Loan Processing Fee | 495.00 |
| Settlement/Closing Fee | 350.00 |
| Courier fee | 15.00 |
| Prepaid interest | 184.80 |
| Total amount financed: | $49,045.20 |

minus costs listed in § 226.32(b)(1)(iii) and (iv) included in points and fees and creditor financed:

| | |
|---|---|
| Title Insurance | $ 54.67 |
| Title Endorsement 9.0 | 25.00 |
| Flood search | 15.00 |
| Total Loan Amount | $48,950.53 |

The $3,664.67 in points and fees, as adjusted above, does not exceed $3,916.04: the amount that equals eight percent of the total loan amount. Accordingly, this loan does not qualify for HOEPA treatment; therefore the defendant did not violate its disclosure provisions. As a result, judgment shall be entered in favor of the defendant on Count II.

### VI.

In Count I, the last claim remaining, the plaintiffs allege that the defendant violated the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 *et seq.* The plaintiffs raise three bases for asserting that the defendant made material[33] misdisclosures entitling them to rescind this loan transaction. Plaintiffs' Post–Trial Memorandum ¶ III(B).

First, the plaintiffs maintain that they did not receive the required HOEPA advance disclosures. For reasons just addressed, that contention was unproven. Second, they argue that they did not receive the required two copies of the rescission notice. As was discussed earlier, that claim cannot now be considered as it was never part of the claims asserted prior to trial, and the plaintiffs' request to amend their complaint was denied.

What remains for determination is the plaintiffs' third assertion of a material nondisclosure. According to the plaintiffs, the defendant's failure to include certain fees in the disclosed finance charge resulted in a material understatement of the finance charge (and thus also in the annual percentage rate), and a concomitant material overstatement of the amount financed, in violation of 15 U.S.C. § 1638.[34]

Separate from seeking rescission for a material misdisclosure under the TILA, the plaintiffs also tersely mention an entitlement to statutory damages in their reply post-trial memorandum. *See* Plaintiffs' Response at ¶ I.G.b. As this claim was included in the Wherefore Clause of count I of their complaint, the defendant's liability for statutory damages, separate from rescission, must also be considered.

33. "Material disclosure" is a term of art. If a loan transaction governed by TILA contains material disclosure violations, then the rescission period is extended for three years. 12 C.F.R. § 226.23(a)(3). "The term 'material disclosures' means the required disclosures of the annual percentage rate, the finance charge, the amount financed, the total payments, the payment schedule, and the disclosures and limitations referred to in § 226.32(c) and (d)." *Id.* at n. 48. Thus the allegation that the APR and finance charge were improperly disclosed would, if proven, be a material violation.

34. The finance charge plus the amount financed equals the total of payments. 15 U.S.C. § 1638(a)(5) ("The sum of the amount financed and the finance charge, which shall be termed the 'total of payments'."). The total of payments is simply the sum of all payments the borrower is obligated to make under the loan. Thus, if the lender understates the true finance charge, it must also have overstated the true amount financed, as the loan repayment schedule remains the same. In addition, the APR is directly correlated with the finance charge. If the lender misstates one, it has miscalculated the other.

## A.

A lender must disclose accurately the finance charge in consumer credit transactions. 15 U.S.C. § 1638(a). The finance charge "includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction." 12 C.F.R. § 226.4(a).

As briefly noted earlier, TILA contains a "safe harbor" or margin of error for annual percentage rate and finance charge disclosures: creditors face no liability under the TILA if the disclosed finance charge "(A) does not vary from the actual finance charge by more than $100; or (B) is greater than the amount required to be disclosed under [15 U.S.C. §§ 1601 et seq.]." 15 U.S.C. § 1605(f)(1). Additionally, as amended in 1995, the statute provides that the finance charge in connection with TILA rescission claims—i.e., a material disclosure requirement—will be treated as accurate if it does not vary from the actual finance charge by more than one half of one percent of the total amount of credit extended. 15 U.S.C. § 1605(f)(2)(A).[35] *See, e.g., Marquez v. New Century Mortgage Corp.*, 2004 WL 742205, at *2 (N.D.Ill. April 5, 2004); *Quinn v. Ameriquest Mortgage Co.*, 2004 WL 316408, at *3 (N.D.Ill. Jan.26, 2004);

*Johnson v. Know Financial Group, L.L.C.*, 2004 WL 1179335, at *9–*10.

Regulation Z combines the tolerance of 15 U.S.C. §§ 1605(f)(1)(A) and 1605(f)(2)(A) in its provision governing loan rescission. Section 226.23(g) of the Federal Regulations provides that, for purposes of rescission, the finance charge shall be considered accurate if the disclosed charge "(i) is understated by no more than ½ of 1 percent of the face amount of the note or $100, whichever is greater; or (ii) is greater than the amount required to be disclosed." 12 C.F.R. § 226.23(g).

In addition to combining the tolerances, the regulation expressly notes the applicability of those tolerances only to understatements of the finance charge, rather than to any variance (*i.e.*, overstatements as well as understatements).[36] Therefore, if the finance charge and annual percentage rate are overstated in loan disclosures, the lender is not liable. 15 U.S.C. § 1602(z); *see, e.g., VanDenBroeck v. Commonpoint Mortgage Co.*, 22 F.Supp.2d 677, 688–89 (W.D.Mich.1998) (explaining that Congress concluded that overstatement of the finance charge—which renders the loan less attractive to borrowers when they comparison shop—would not undermine the disclosure requirements of TILA and thus would yield no liability); *In re Ramsey*, 176 B.R. 183, 188–89 (9th Cir. BAP 1994).[37]

---

**35.** The safe harbor of section 1605(f)(2)(B) does not apply to this transaction, as it is limited to loans that do not provide any new advance of funds. 15 U.S.C. § 1605(f)(2)(B)(ii).

**36.** "Regulation Z 'absent some repugnance to the statute should be accepted by the courts, as should the Board's interpretation of its own regulation.'" *In re Wright*, 133 B.R. 704, 707–08 (E.D.Pa.1991) (quoting *Anderson Brothers Ford v. Valencia*, 452 U.S. 205, 219, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981)).

**37.** Additionally, section 1606(c) provides an APR margin of error of 0.125% of the actual rate. 15 U.S.C. § 1606(c). But because the loan amortization is not uniform, it is more complex to calculate the effect of the APR tolerance on this loan, and the parties have offered no assistance, neither of them briefing this issue in post-trial memoranda. As the plaintiffs focus solely upon the finance charge in their post-trial memorandum, so shall I.

In this proceeding, to surpass section 1605(f)(2)(A)'s safe harbor for rescission purposes, the plaintiffs must demonstrate that the defendant understated the finance charge by more than $264 (0.005 times the loan amount of $52,800.00). *See Scott v. IndyMac Bank, FSB*, 2004 WL 422654, at *2 (N.D.Ill. Feb.3, 2004) (applying 12 C.F.R. § 226.23(g)); *Walker v. Gateway Financial Corp.*, 286 F.Supp.2d 965, 968 (N.D.Ill.2003).

In arguing that the finance charge was understated, the plaintiffs repeat their HOEPA assertions concerning the unreasonableness of certain loan fees. As explained earlier, only the unreasonable component of the fee can be included in the finance charge. *See, e.g., Guise v. BWM Mortgage, L.L.C.; Johnson v. Know Financial Group, L.L.C.; Marquez v. New Century Mortgage Corp.*, 2004 WL 742205, at *3 (only the excessive portion of the title insurance charge was included in the finance charge); *Scott v. IndyMac Bank, FSB*, 2004 WL 422654, at *2 (exclusion of an expense from finance charge to extent reasonable is warranted).

Previously, I concluded that only $54.67 of the title insurance charges, $25.00 of the fee for Title Endorsement 9.0, the $15.00 courier fee and the $15.00 flood plain search fee should have been included among the HOEPA points and fees. Even if the sum of these charges should have been disclosed as part of the finance charge, they total only $109.67, far short of the $264.00 safe harbor. Therefore, the plaintiffs' rescission claim cannot succeed. *See, e.g., Guise v. BWM Mortgage, L.L.C.*[38]

### B.

The plaintiffs also assert that the finance charge was understated, and that

this renders the defendant liable for statutory damages of $2,000. To demonstrate such liability, they need to prove that the understatement exceeded $100. 15 U.S.C. § 1605(f)(1). *See generally Egert v. FT Mortg. Companies*, 1999 WL 528517, at *2 (N.D.Ill. July 19, 1999); *VanDenBroeck v. Commonpoint Mortg. Co.*, 22 F.Supp.2d 677, 688 n. 7 (W.D.Mich.1998), *aff'd on other grounds*, 210 F.3d 696 (6th Cir.2000).

Not surprising in this complicated area of law, the standard for including fees as a component of the finance charge for HOEPA purposes are not identical to that when considering liability under TILA. Certain fees are excluded from the finance charge for HOEPA purposes only if the fee is reasonable, the creditor receives no direct or indirect compensation, and the charge is paid to an unaffiliated third party. *See* 12 C.F.R. § 226.32(b)(iii). On the other hand, certain fees are excluded from the finance charge for TILA purposes so long as they are bona fide and reasonable in amount. *See* 12 C.F.R. § 226.4(c)(7). Thus, the $15 flood search fee, included in the finance charge for HOEPA purposes because it was paid to the lender, is properly excluded from the finance charge for TILA purposes as there was no allegation that the flood search fee was either not bona fide or not reasonable. *See* 12 C.F.R. § 226.4(c)(7)(iv).

Regarding many of the other fees under consideration, the plaintiff has not challenged the bona fide nature of the fee, only its reasonableness. As I interpret the term reasonable identically under TILA as under HOEPA, *Johnson v. Know Financial Group, L.L.C.*, 2004 WL 1179335, at *8, my earlier determinations that the ap-

---

**38.** I have analyzed this issue as the parties did. As will be mentioned below, however, it is possible that even if one adds $109.67 in fees to compute an accurate finance charge,

the finance charge actually disclosed to the plaintiffs may still be an overstatement, not an understatement.

praisal, document preparation, and Title Endorsement 8.1 fees were reasonable, and therefore properly excluded from the finance charge, remain the same. Similarly, my conclusion that the title insurance fee included an unreasonable portion of $54.67, and the Title Endorsement 9.0 fee included an unreasonable portion of $25, dictates that those amounts should also have been disclosed as part of the finance charge for TILA purposes.

As for the satisfaction fee, the plaintiffs only argued that it was unreasonable because they thought they had been double-charged, a contention that was unproven.[39] Finally, as for HOEPA purposes, the $15 courier fee should have been included in the finance charge pursuant to 12 C.F.R § 226.4(a)(2).

Thus, the total of fees that should have additionally been included in the prepaid finance charge for TILA purposes is only $94.67 ($54.67 for title insurance, plus $25.00 for the Title Endorsement 9.0 and $15.00 for the courier fee), below the $100.00 threshold.[40]

Accordingly, the plaintiffs have not demonstrated any actionable understatement of the finance charge (and thus no actionable misstatement of related disclosures). Therefore, judgment in favor of the defendant is also required on count I.

## VII.

In conclusion, the plaintiffs failed to prove that any errors committed by the defendant in the loan disclosures provided

**39.** I shall assume *arguendo* that a fee charged for the satisfaction of a mortgage is required to be part of the finance charge if that fee is duplicative. I note, however, that Regulation Z is not clear on whether a mortgage satisfaction fee is included in or excluded from the finance charge for TILA purposes.

Regulation Z states that fees prescribed by law to be paid to public officials "for determining the existence of or for perfecting, releasing, or satisfying a security interest" may be excluded from the finance charge if itemized and disclosed. 12 C.F.R. § 226.4(e)(1). No exception is stated for unreasonable satisfaction fees.

**40.** Even if one were to include the $15 flood search fee, it is likely that the $100 threshold still would not be exceeded.

One method of calculating the finance charge is to first compute the amount financed and subtract that figure from the total of payments. *See* 15 U.S.C. § 1638(a)(5). Rather than itemizing an amount financed, a lender may simply rely upon a good faith estimate of settlement costs provided to the borrower, 12 C.F.R. § 226.18(c)(1) n. 40, as it appears this defendant did. Exs. Tab–36, Tab–37.

It is likely that the defendant computed the finance charge actually disclosed to the plaintiffs on the TILA disclosure statement as follows:

It subtracted certain charges listed in the left hand column of the "Good Faith Estimates" form from the $52,800 loan amount to yield the amount financed. (These items are: "discount points," "tax service contract fee," "processing fee," "interest," "settlement or closing fees," "courier fee/messenger fee," and "demand/beneficiary fee.") It next determined what it considered an appropriate interest rate to compute the total of payments. *See* Ex. Tab–13. It then subtracted the computed amount financed from the total of payments. (Obviously, if the initial computation of the amount financed is understated, then by this method the finance charge disclosed will be overstated.) Upon my review of the Good Faith Estimates, if this method was utilized, the defendant appears to have included in its finance charge calculation a processing fee of $595, instead of the $495 actually charged to the plaintiffs, and a courier fee of $100 instead of the $15 actually charged. Ex. Tab–37.

If it did so, at least one court has determined that any overstatements of the finance charge made by a lender should be used to offset any understatements. *Marquez v. New Century Mortgage Corp.*, 2004 WL 742205, at *3. If that were done in this instance, the actual finance charge, even inclusive of the flood search fee, would have been overstated rather than understated. Thus, no liability could be assessed against this defendant.

to them justify the imposition of liability under either TILA or HOEPA. To the extent errors were made, they fell within the tolerance levels permitted by Congress.

The plaintiffs also failed to prove that the underlying loan transaction in May 1999 was the product of unfair trade practices by the defendant or was so grossly unfair as to be unconscionable. As the plaintiffs acknowledged at trial, their eagerness to obtain a loan to renovate their kitchen, along with their failure to read the various loan documents provided to them, caused them to agree to loan terms that they regret upon reflection. Such somber reflections should have been acted upon during the three-day rescission period. At this point, the terms of the loan agreement remain enforceable (subject to any modifications permitted by the Bankruptcy Code).

An appropriate order shall be entered.

### ORDER

AND NOW, this 31st day of August 2004, for the reasons stated in the accompanying memorandum, it is hereby ordered that judgment on Counts I, II, V and VI is entered in favor of the defendant and against the plaintiffs. (Judgment in favor of the defendant on Counts III and IV was previously entered on summary judgment.)